(Decided 7th January, 1869.)

---

# THE COMMERCIAL AND FARMERS' NATIONAL BANK OF BALTIMORE *vs.* THE FIRST NATIONAL BANK OF BALTIMORE.

## *Bank Depositor—Forged Check—Clearing House—Negligence.*

On the 20th of December, 1868, H presented himself at the Commercial and Farmers' National Bank, to whose officers he was unknown, and stated that he desired to open an account, and presented a check on the First National Bank, for $4,600.15, purporting to have been drawn by A, dated the 18th of December, and payable to the order of H, who endorsed it, and the amount of the check was entered to his credit as cash in a bank book furnished by the bank; but on the same day the teller was directed by the cashier not to allow the account to be drawn upon until the deposited check was known to be good or was paid. On the following morning this check was sent to the Clearing House and thence was taken to the First National Bank, where it was passed as genuine by the proper officers of the bank, charged to the account of A, and credited to the Commercial and Farmers' National Bank. By the custom and usage of all the banks in the city of Baltimore, where a check is sent through the Clearing House to the bank on which it is drawn, and is not heard from before eleven o'clock of the day on which it is so sent, the

bank sending it has the right to assume it was good or had been paid and to act accordingly. On the 22d December, H called at the bank where he had made the deposit, with his bank book, filled up a check for $4,500, payable to his own order, and handed it for payment to the paying teller, who, after satisfying himself by inquiry of the receiving teller as to his identity, and by the examination of the books of the bank as to the state of his account, paid him the amount of his check. On the 24th December, the account of A was overdrawn to the amount of $372, on the books of the First National Bank, and the overdrawing continued until the 29th, when his account was overdrawn $2,297; after bank hours of that day, A was for the first time informed by the bank officers of such overdrawing; when upon an examination of his account and checks, he pronounced the check deposited by H, a forgery. Notice of the forgery was given by the First National Bank to the Commercial and Farmers' National Bank, on the 31st of December, and re-payment of the money demanded; but the latter denied its liability beyond the $100.15, still remaining to the credit of H. The First National Bank having refunded to A the amount of the forged check, sued the Commercial and Farmers' National Bank, to recover the amount thus paid. HELD:

1st. That the law imposed upon the First National Bank the obligation of knowing the signature of A, one of its depositors, and it is therefore not entitled to recover from the Commercial and Farmers' National Bank the sum of $4,500, paid by the latter to H; for as between parties equally innocent and equally deceived, but where one is bound to know and to act upon its knowledge, and the other has no means of knowledge, the loss should be thrown upon the former rather than upon the latter.

2d. That the sending of the check deposited by H, through the Clearing House by the Commercial and Farmers' National Bank, and the failure to communicate to the First National Bank the fact that it was received from a stranger, was not such negligence as should throw the loss upon the former bank.

3d. That the First National Bank is entitled to a judgment for $100.15, the balance remaining in the Commercial and Farmers' National Bank to the credit of H.

APPEAL from the Superior Court of Baltimore City.

The facts in this case are stated with great fulness and clearness in the opinion of the Court, and need not be repeated. Three prayers were presented by the plaintiff and six by the defendant. The Court (MARTIN, J.) granted

the plaintiff's first prayer with a qualification, and rejected its second and third, as also the prayers of the defendant.

The Court's instruction was to the effect, that upon the facts the plaintiff was entitled to recover, unless the jury should find that it did not use reasonable diligence to ascertain whether the check in question was genuine before it paid it, or if the plaintiff, by the exercise of reasonable diligence, could have discovered the forgery in time to have enabled the defendant, upon receiving notice thereof, to protect itself from loss by withholding from its depositor the payment of the $4,500.

The six prayers of the defendant presented, in somewhat different forms, the general proposition that the defendant, having been induced to pay to Hillan the $4,500 by the failure, whether negligent or not, of the plaintiff to detect the forgery of the signature of its well known customer, Horace Abbott, and having paid the same in good faith and without notice of the forgery, was entitled upon the principles of equity, applicable to an action for money had and received, to retain such sum, and the loss should fall where the course or accident of the transaction had left it.

To the instruction as granted and to the rejection of its prayers by the Court the defendant excepted, and the verdict and judgment being against it, the present appeal was taken.

The cause was argued before BARTOL, C. J., GRASON, MILLER and ALVEY, J.

*John P. Poe* and *Fielder C. Slingluff*, for the appellant:

The appellant was guilty of no negligence in sending the check to the appellee in the usual and customary way, through the clearing house; and on the 22nd of December, it had a right to assume that the check had been honored, and was accordingly justified in paying the $4,500 to its depositor, Hillan, on that day.

Commercial and Farmers' National Bank vs. First National Bank.

The appellant having in the first instance been merely an agent for collection, known as such to the appellee, and not an endorser of the forged check, and having collected it in the usual and customary way, in good faith, without negligence and without notice of any defect or infirmity, and having, in reliance upon the recognition and payment of it by the appellee as a genuine check, changed its position to its prejudice by the payment of the $4,500 on the 22nd of December, was, after such payment, a *bona fide* holder for value as to such $4,500, and was consequently entitled to retain the same.

In an action such as this, for money had and received, the law will leave the parties where the transaction left them, and both being equally innocent morally, will not require the appellant to repay money to which its equitable title is at least equal to that of the appellee. *The Merchants Bank vs. The Marine Bank,* 3 *Gill,* 96–126; *Fulton Bank vs. Phœnix Bank,* 1 *Hall,* 570; *Price vs. Neal,* 3 *Burrows,* 1355; *Smith vs. Mercer,* 6 *Taunton,* 76; *Cocks vs. Masterman,* 9 *Barn. & Cress.,* 902; *Gloucester Bank vs. Salem Bank,* 17 *Mass.,* 33; *Bank of St. Albans vs. Farmers and Mech's Bank,* 10 *Vermont,* 141; *Levy vs. Bank of United States,* 1 *Binney,* 27; *Bank of United States vs. Bank of Georgia,* 10 *Wheaton,* 344; *Lancaster vs. Baltzell,* 7 *G. & J.,* 473; *Bernheimer vs. Marshall,* 2 *Minn.,* 78; *Alexander vs. Walter,* 8 *Gill,* 247; *Joice vs. Taylor,* 6 *G. & J.,* 54.

*William Daniel* and *I. Nevett Steele,* for the appellee:

No title can be acquired through a forged endorsement, and an acceptor who pays thereon, may recover back the money so paid. The acceptor is bound only to know the hand writing of the drawer, and the endorsee is bound to know that of his endorser. Reasonable diligence only is required in detecting and giving notice of such a forgery. 2 *Par. on Notes and Bills,* 284, 285, 591, 595, 596 *and* 601; *Canal Bank vs. Bank of Albany,* 1 *Hill,* 293; *Bank of Commerce vs. Union Bank,* 3 *Comstock,* 177; *Graves vs. The Am.*

*Ex. Bank,* 17 *N. Y.,* 205; *Cabot Bank vs. Morton, et al.,* 4 *Gray,* 156; *Merchants' Bank vs. Marine Bank,* 3 *Gill,* 96; *Lancaster vs. Baltzell,* 7 *G. & J.,* 468; *Key vs. Knott and Wife,* 9 *G. & J.,* 342; *Hortsman vs. Henshaw,* 11 *How.,* 177; *Sims vs. Clark,* 11 *Ill.,* 141; *Chitty on Bills,* 430; *Williams vs. Drexel,* 14 *Md.,* 566; *Robinson vs. Yarrow,* 7 *Taunton,* 455; *Dick vs. Leverich,* 11 *Louis.* 573; *Merchants' Bank of New York vs. Exch. Bank of New Orleans,* 16 *Louis.* 457; *Kelly vs. Solari,* 9 *M. & W.,* 58.

Every party who receives negotiable paper, under a written transfer, takes it at his peril. 1 *Par. on Notes and Bills,* 277, and 2 *Par. on Notes and Bills,* 279, 284 *and* 595.

Where a forged check is credited in a bank book as cash, it is payment. *U. S. Bank vs. Bank of Georgia,* 10 *Wheat.,* 347 *and* 348; *Levy vs. Bank U. S.,* 4 *Dall.,* 234; 1 *Bin.,* 27.

The signing of a fictitious name is, in law, a forgery. 2 *East, P. Cr.,* 957; *People vs. Fisher,* 1 *Wend.,* 198; *Rex vs. Peacock, Russ. & Ryan,* 282; 3 *N. Y. Dig., (Abbott,)* 182; *United States vs. Turner,* 7 *Peters,* 137.

Where no account is given of the man, the name is presumed to be fictitious. *Smith vs. Mechanics and Traders' Bank,* 6 *La., Ann.,* 616, 617, &c.

A party receiving a check, payable to order, is bound to make due inquiry as to the identity of the payee, which the appellant in this case neglected or failed to do. 3 *Comstock,* 236; *Chitty on Bills,* 430; *Van Bibber vs. Bank of La.,* 14 *La. Ann.,* 482; *Pringle vs. Phillip,* 5 *Sand., (N. Y.,)* 157; *Snow vs. Peacock,* 3 *Bingham,* 406.

Where one of two innocent parties must suffer loss from the wrong of a third, it must fall on the one who enabled the third to commit it. *Story on Agency,* 72 *and* 321; *Canal Bank vs. Bank of Albany,* 1 *Hill,* 290; 3 *Comstock,* 236.

MILLER, J., delivered the opinion of the Court.

This case presents questions of considerable interest to the public, and of importance to the banking institutions of the

State.   The material and undisputed facts, which must be stated somewhat in detail, are these: On the 20th of December, 1866, about 2 o'clock, P. M., an individual, well dressed and of respectable appearance, but a stranger unknown to any of its officers, came to the counter of the receiving teller of the Commercial and Farmers' National Bank, said he wished to open an account, and presented a check on the First National Bank of Baltimore for $4,600$\frac{15}{100}$, purporting to be drawn by Horace Abbott, dated the 18th of December, and payable to the order of John S. Hillan.   The teller, who knew Mr. Abbott's financial standing to be good, and had seen his checks before, produced the signature book in which the man put the name "John S. Hillan, No. 504 W. Fayette street," and endorsed the check at the counter in that name. The teller then gave him a customer's small bank book, in which the amount of the check was put to his credit as cash; but on the same day the teller was directed by the cashier not to allow the account to be drawn upon until the deposited check was known to be good or was paid.   On the morning of the next day, the 21st, this with other checks was sent by the Commercial and Farmers' Bank to the clearing house, its amount being noted on the lists which were there balanced and settled.   From thence it was taken to the First National Bank, where it was passed as genuine by the proper officers of that bank, charged to Mr. Abbott's account, and credited to the Commercial and Farmers' Bank.   By the custom and usage of all the banks in the city of Baltimore, proved by all the witnesses, where a check is sent through the clearing house to the bank on which it is drawn, and is not heard from before eleven o'clock on the day on which it is so sent, the bank sending it has the right to assume it was good or had been paid, and to act accordingly.   On the following day, the 22d, after the check had thus been accepted as genuine and paid by the First National Bank, the same person presented himself at the counter of the paying teller of the Commercial and Farmers' Bank with his bank book,

and said he wanted to draw some money; a blank check was given him which he filled up for $4,500, payable to self or bearer, and signed the name "John S. Hillan." The teller ascertained from the books the amount to his credit, and from the receiving teller his identity with the individual who had previously made the deposit, compared the signature of the check with that on the signature book, asked him how he wanted the money, and whether he was going to use it in Baltimore, with a view of endorsing the check good, if he wished to use it in the city among the merchants; but the man replied he wanted to take the money to Washington, and the teller then paid him the $4,500 in small notes of fives and tens, making quite a large bundle.

Mr. Abbott was a large customer and depositor of the First National Bank, and was absent from Baltimore, from the 14th to the 22d of December. His account charged with this check was overdrawn by him on Monday the 24th, to the amount of $372$\frac{48}{100}$, and the overdrawing continued during the week until Saturday the 29th, when his account was overdrawn $2,297, and after bank hours of that day, he was for the first time informed by the bank officers of such overdrawing. This information led to an immediate examination of his account and checks, when he discovered the check in question, pronounced it a forgery, and stated he never knew such a man as John S. Hillan, and had never drawn such a check. The forgery of his name was very skilfully executed and difficult of detection, and the check itself was in printed form exactly similar to those used by him from his check book. Notice of the forgery was given by the First National Bank to the Commercial and Farmers' Bank, on Monday the 31st, and re-payment of the money demanded, but the latter denied its liability beyond the $100$\frac{15}{100}$ still remaining to Hillan's credit. No such person as John S. Hillan could be discovered or traced.

The First National Bank having refunded to Abbott, brought this action against the Commercial and Farmers'

Bank to recover back the money the former had thus paid on this forged check. The declaration contains the common counts for money paid by the plaintiff for the defendant, at its request; for money received by the defendant for the use of the plaintiff; and also special counts for money paid by the plaintiff to the defendant, at its request, on this forged check.

It is our first duty to determine what principles of law are to govern the decision of the case upon the conceded facts above stated. In arriving at a just conclusion upon this subject, we are without the aid of any express adjudication of our own Courts, for no case similar in its circumstances has heretofore arisen in this State. The case of *The Merchants' Bank vs. The Marine Bank,* 3 *Gill,* 96, is materially different in that there was there a genuine instrument upon which there was a forged endorsement of the payee's name, whereas here the check is a forgery throughout. We think, however, the legal principles which must guide and control our judgment have been settled by decisions elsewhere of the highest authority.

In the early case of *Price vs. Neal,* 3 *Burr.,* 1354, where an action of *assumpsit* was brought to recover back from the endorsee and holder, money which had been paid to him by the drawee on two bills of exchange, one of which was paid without acceptance, and the other accepted and then paid, and on both of which it was afterwards discovered the drawer's name had been forged, LORD MANSFIELD, after adverting to the form of action as one in which the plaintiff could not recover the money unless it be against conscience in the defendant to retain it, said: "but it can never be thought unconscientious in the defendant to retain this money when he has once received it upon a bill of exchange endorsed to him for a fair and valuable consideration, which he had *bona fide* paid without the least privity or suspicion of the forgery. Here was no fraud, no wrong. It was incumbent on the plaintiff to be satisfied that the bill drawn upon him *was the drawer's*

*hand* before he accepted or paid it; but it was not incumbent on the defendant to inquire into it." The authority of this case so far as it proceeds upon the ground that the drawee is bound to know the handwriting of his correspondent, and as applicable to the case of a bill accepted or paid by the drawee, where the drawer's name has been forged has never been questioned but has been uniformly and abundantly sustained. It is because the acceptor is bound to this knowledge that in an action against him the handwriting of the drawer need not be proved. The same rule has been extended to bank notes and bank checks and for precisely the same reason. A bank which receives money on deposit, and thence derives profit is justly held to the obligation to know the signatures of its depositors to their checks, and if it pays in mistake a forged check there is no reason why the loss should be shifted to another innocent party upon whom the law casts no such obligation, and who, upon the faith of such payment, has parted with his own money or been placed in a worse position than he would have been but for such payment.

Another instance of the application of the same principle is found in *Smith vs. Mercer,* 6 *Taunton,* 76. There the acceptance was forged, and the bill paid at maturity to a holder for value, by the bankers of the acceptor where he kept his cash, and where by the forged acceptance it was made payable. The forgery was discovered a week afterwards and notice given to the defendant, but it was held that the bankers were not entitled to recover. The strongest instance perhaps of the enforcement of the rule is that of *Levy vs. Bank of the United States,* 1 *Binney,* 27, *and* 4 *Dallas,* 234, where one Thomas passed to the plaintiff, Levy, a check for $2,600 on the bank, purporting to be drawn by Charles Wharton, in favor of Thomas or bearer. The plaintiff sent his clerk to the bank with the check, and it was received by the teller and entered to Levy's credit in his bank book as cash. A few hours afterwards on the same day, it was discovered that Wharton's name had been forged by Thomas, and notice thereof was

given to Levy, and yet the loss was thrown upon the bank.

In every stage of the case which underwent three several arguments in different Courts the decisions were in favor of Levy. The entry in his book as cash was treated as payment of the check by the bank, and upon the authority of *Price vs. Neal*, it was held to be the duty of the bank to know the handwriting of its depositor, and having paid the check to a holder for value who had no suspicion of the forgery, it must bear the loss.

In another case (*United States Bank vs. Bank of Georgia,* 10 *Wheat.*, 333,) bank notes issued by the Bank of Georgia, which had been fraudulently altered in course of circulation, found their way into the Bank of the United States, and the latter presented them to the former who received them as genuine and placed them to the general account of the latter as cash by way of general deposit. The forgery was discovered nineteen days thereafter, and it was decided by the Supreme Court of the United States the loss must fall on the Bank of Georgia, whether the transaction be regarded as a payment or an acceptance of the notes. Mr. Justice STORY, who delivered the opinion of the Court in that case, reviewed all the authorities and held that the receipt by a bank, of forged notes purporting to be its own, must be deemed an adoption of them as it has the means of knowing whether they are genuine or not: "and in respect to persons equally innocent where one is *bound to know* and act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with any loss in exoneration of the former. There is nothing unconscientious in retaining the sum received from the bank in payment of such notes, which its own acts have deliberately assumed to be genuine."

In a more recent case (*Bank of St. Albans vs. Farmers and Merchants' Bank,* 10 *Vermont,* 141,) the same doctrine has been affirmed and enforced by the Supreme Court of Vermont. There, a check upon the Bank of St. Albans in favor

of one Wilson, or bearer, was purchased by another bank from the alleged payee, *an entire stranger,* who endorsed it in the name of Wilson, and it was paid on presentment by the bank on which it was drawn.   It was subsequently discovered that the name of the maker, who was the president and a customer of the bank, was a forgery, and a like result attended the effort to recover back the money.   We may also refer to the case of *Bernheimer vs. Marshall,* 2 *Minnesota,* 78, for a very clear and well reasoned decision upon the same subject and to the same effect.

The facts, as well as the principles of these cases, have been cited with some particularity, because of their close resemblance in many instances to those of the case at bar.   In our opinion the case before us falls within the general doctrines settled by these authorities, and is distinguishable from that class of cases, where forged securities of third persons have been received in payment, as well as from those which have established the rule, that if a party pays money under a mistake of the real facts, and no *laches* are imputable to him, in respect of his omitting to avail himself of the means of knowledge within his power, he may recover it back.   Nor is the rule of commercial law, that no title can be acquired through a *forged endorsement,* which was specially relied on by the appellee's counsel in argument, and was the ground upon which the Court below proceeded in granting the plaintiff's first prayer applicable here.   The rule as stated is no doubt clearly settled, but its very statement shows it can have no bearing on such a case as the present.   It pre-supposes a genuine negotiable instrument, the title to which can be transferred by a valid endorsement; but it is a solecism to say, any title can be acquired to that which has in fact no existence.   The endorsee of a check or note to which the maker's name is forged, of course acquires no *title* from an endorsement, and no rights as against any one where the endorsement is made to him directly by the forger or his accomplice, and it matters not in such case what may be the

form of the forged instrument, whether payable to order or bearer. It is therefore perfectly immaterial to the rights of the parties to this suit whether the name John S. Hillan, the payee in the check, was a fictitious name inserted by the forger and endorsed thereon by the person who deposited the check with the defendant, or was the genuine name of the criminal thus acting. In neither case could the defendant have derived any title by such endorsement, and in the sense of acquiring title from one capable of transferring the paper, it cannot be pretended the defendant was a *bona fide* holder. The appellant's defence does not rest upon this ground. Its legitimate defence is, that in entire innocence and without suspicion of the forgery, it received in the course of business a forged check on deposit, and sent it through the regular channel of communication, for payment to the plaintiff, on whom it purported to be drawn and upon whom the law cast the duty and obligation of knowing the maker's signature; that the plaintiff adopted it as genuine and actually paid it to the defendant, and after such recognition and payment, and on the faith thereof, the defendant paid over a large part of the money to the same party who had made the deposit. Apart from any other facts or considerations than these, there is in the language of the authorities cited nothing unconscientious in the defendant's retaining the money, and no reason why the loss as between parties thus equally innocent and equally deceived, but where one is bound to know and act upon his knowledge, and the other has no means of knowledge, should be thrown upon the latter in exoneration of the former. The safest rule for the commercial public, as well as that most consistent with justice, is to allow the loss to remain where by the course of business it has been placed. Nor is the argument sound, that the defendant was placed in no worse position in consequence of the plaintiff's payment of this check, because by receiving and treating it as a deposit *in cash,* it assumed to take the risk of its genuineness as between itself and the depositor, or parties whom he might have in-

duced to advance money, or give him credit upon the faith of the statement in the bank book delivered to him, at the time the deposit was made. How far the defendant might have been estopped from denying its responsibility, to those who might have dealt with the party calling himself Hillan, on the faith of this representation of a deposit to his credit as cash, it is not necessary to inquire. Such a case might depend on a variety of considerations, and will be seasonably decided when it arises. It is sufficient for our present decision to say, that no such question is presented by this record. The payment here was in fact made to the same party who made the deposit, the forger himself or his confederate, and in our judgment it is very clear the defendant had the right as between itself and this party to instruct its officers, notwithstanding the entry to his credit as cash, not to allow the account to be drawn upon, until it was first ascertained that the deposited check was good or had been paid. Having done so and having in fact paid to such party, after the check had been paid by the plaintiff, it is impossible to say the defendant has not been placed in a worse position in consequence of such payment by the plaintiff.

It follows from these views there was error in granting the plaintiff's first prayer, and for this error the judgment must be reversed. The remaining inquiry is, ought the case to be sent back for a new trial? Upon this question we have already, in a measure, indicated our opinion. It has been the uniform practice of this Court to refuse a *procedendo* where it is apparent from the record the plaintiff is not entitled to recover, in view of the law of the case pronounced by the appellate tribunal. What that law in the present case is upon the undisputed facts, we have already determined. The two grounds upon which it is supposed the plaintiff is entitled to recover independently of the law thus announced, are stated in its second and third prayers, which were rejected by the Court below. The first places the plaintiff's right to recover solely upon the ground that the jury

might find, from the evidence, that there was a general and well established usage of the banks in Baltimore, to the effect that where one bank sends to the clearing house a check on another bank, payable to order and purporting to be endorsed by the payee, the bank sending it guarantees the endorsement of the check to be the genuine endorsement of such payee. We need not stop to inquire whether there is evidence proper to be submitted to the jury of the existence of such usage, because we have shown it was immaterial to the rights of these parties whether the endorsement of Hillan's name was genuine or fictitious, the drawer's name being a forgery. The proposition that the plaintiff could recover in this case upon the basis of such supposed guarantee, assumes that the obligation of knowing the hand writing of Abbott was thrown as much upon the defendant, who had no means of such knowledge, as upon the plaintiff who had the means and who was in law presumed to know his signature, and is in direct conflict with the authorities before cited.

The second ground proceeds upon the theory that there was a general and well known usage among the banks in the city of Baltimore, not to receive on deposit a check drawn upon another bank from the alleged payee, unless he is known to some of its officers or is introduced or identified by some person so known, that the party calling himself Hillan, the forger or his confederate, was entirely unknown to the officers of the defendant, and they did not take the precaution of requiring any evidence of identity; that the defendant's cashier, on hearing the fact that the check had been received from a stranger, directed the teller not to permit the party to draw on the deposit until the check had been paid by the plaintiff, and then sent the check through the clearing house in the usual way without notice to the plaintiff of the circumstances under which it was received and held, and it is insisted that if the jury found this usage and these facts in connection with those stated in the first prayer, and that by this negligence of the defendant in so

receiving the check and sending it to the clearing house for payment, the forger was enabled to consummate his intended fraud, the plaintiff is entitled to recover.

In our opinion the question of negligence as affecting the rights and determining the responsibility of these two banks in this transaction, must stand on grounds entirely independent of the supposed usage not to receive deposits from strangers without identification. The defendant's officers do not admit *knowledge* of any such custom, and aver that no such uniform practice has been adopted by their bank. But the whole object and purpose of this practice in each bank where it prevails, is obviously protection and security for itself and not of other banks with which it has dealings. The defendant had a clear legal right to receive this check on deposit as it did, and if it acted negligently in so doing, or had cashed the check at once instead of receiving it on deposit, it certainly would have incurred the risk of loss to itself, but we cannot perceive how this could help the plaintiff's case or excuse its own negligence in law, or enable it to escape the consequences of its failure to detect the forgery of its customer's name, when the check was presented to it for payment. It certainly would be very unsafe to decide that a bank can be excused for the negligent performance of the duty imposed by law of examining its customer's signature to a check, because the innocent holder happening to be another bank has merely failed in receiving it, to observe a usage or practice adopted for its own security. Their own interests will prompt banks to adopt proper precautions in receiving deposits as well as in paying out money, but something more is required than the mere non-observance of the usage here attempted to be set up, in order to throw the loss in this case upon the defendant in exoneration of the plaintiff. So that at last the question presented resolves itself into this: Can it be said, as matter of law, that the sending of this check through the clearing house and the failure to communicate to the plaintiff the fact that it was received from a stranger,

amount to such negligence as will throw the loss upon the defendant, or ought a jury to be permitted, from these facts or any circumstances disclosed in evidence, to infer such negligence and find a verdict for the plaintiff for the full amount claimed.

It was at one time held in cases where bills, notes or other securities, transferable by delivery, were lost or stolen, that it was a sufficient defence to an action by the holder for value, that he had received them under circumstances which ought to have excited the suspicion of a careful and prudent man, but the English decisions following that of *Gill vs. Cubitt*, 3 *Barn. & Cress.*, 466, adopting this doctrine were subsequently overruled, and LORD DENMAN, in *Goodman vs. Harvey*, 4 *Adol. & Ellis*, 870, has said: "I believe that we are all of opinion that gross negligence only would not be a sufficient answer where the party has given a consideration for the bill. Gross negligence may be evidence of *mala fides*, but it is not the same thing. We have shaken off the last remnant of a contrary doctrine. Where the bill has passed to the plaintiff without any proof of *bad faith*, there is no objection to his title." The weight of American authority is to the same effect. *Murray vs. Lardner*, 2 *Wallace*, 110.

We do not mean to adopt this law as applicable in all its bearings to a case like that now before us, or to decide that a case may not arise in which bank officers and agents may, in receiving a check, act in a manner so grossly negligent, even without *mala fides*, or by their conduct so mislead and lull into security the bank called upon to pay, as to excuse its failure to immediately detect the forgery, and where a jury may very properly be allowed to pass upon such conduct and negligence as most essentially facilitating the fraud, and occasioning the loss, and find a verdict accordingly. But in view of the long series of decisions settling the law so as to protect innocent holders for value, a much stronger case must be made out than is presented by this record. There is no pretence of bad faith on the part of the defendant. It received

the check in the ordinary course of business and sent it through the usual channel for payment. We cannot sanction so loose a doctrine as to hold that the fact that it came through the clearing house affords any shadow of excuse to the plaintiff. The law attaches no sanctity to this source of communication, and none in fact can be imputed to it. The legal effect of what was done here as in every case of presentment and demand is this: the defendant said to the plaintiff, "we hold this check on your bank, purporting to be drawn by one of your customers, and demand its payment," and it can make no difference through what source this demand was made, whether by letter, or by special messenger, or through the clearing house.

The appearance, acts and conduct of the party, both when he made the deposit and when he drew out the money fail to exhibit so far as the proof discloses, anything affording rational grounds of suspicion of the forgery. The direction of the defendant's cashier to its teller imports nothing more than proper precaution on his part to protect his own bank from loss, consequent in his mind from the risk incurred in receiving the check from a stranger. There was nothing, therefore, to be communicated important for the plaintiff to know, unless it be determined that in every case where a check is received from a stranger it is the legal duty of the holder to communicate this fact to the bank on which it is drawn, before or at the time of its presentment and demand for payment, and that the failure to do this is negligence or evidence of negligence affecting his right to retain the money paid upon the check, in case it should afterwards be discovered to be a forgery. We are not prepared to lay down so stringent a rule as this. Indeed, it is difficult to perceive of what service this knowledge would have been to the plaintiff, unless we assume it had the means of knowing, not only Mr. Abbott's signature, but was familiar with his business, and knew all the parties with whom he had dealings and to whom it became necessary for him to give checks; and if it had such knowledge the fact

to whom this check was given, was as effectually imparted from the face of the paper itself, as it could have been by any written or verbal communication from the defendant. But if it should be held the non-communication of this fact or any circumstance attending the whole transaction was negligence or evidence of negligence in the defendant, what can be said of the conduct of the plaintiff, not only in paying the check, but in retaining it for a week, and in the meantime allowing Abbott's account to be overdrawn, from day to day, to a large amount without notice to him of that fact, so as to lead to a more speedy detection of the crime, the arrest of the forger and recovery of the money which the defendant had paid to him ? The chance of discovering the criminal and recovering the money was certainly diminished by each day's delay, and if the negligence of either party, apart from the legal obligation resting upon the plaintiff to know Abbott's signature, can be regarded as most essentially facilitating the fraud, and occasioning the loss, and the liability therefor could be thereby determined, we should be forced to say the superior negligence was upon the plaintiff.

After a careful and patient examination, both of the law and the facts of the case, we are satisfied there is no ground for a *procedendo*. The case in short in all its features demonstrates the propriety of the rule established by the authorities we have cited. We are fully aware of the importance of so settling and applying the law as not to facilitate the success of frauds, and of the difficulty of detecting the skilful forgeries unfortunately so prevalent in recent times. But the law has fastened the obligation of knowing the signatures of its cus-. tomers upon the bank which receives their money on deposit, and undertakes to pay it out on their checks. Greater safeguards and precautions must be devised and adopted by banks to ascertain, before payment, the genuineness of checks drawn upon them. The primary obligation and duty are there placed, and in the careful discharge of that duty, and in the just severity of Courts in punishing to the extreme limits of

the law the guilty perpetrators of such crimes, the community will find its best security.

The defendant admits its liability to the extent of the $100$\frac{15}{100}$, still remaining in its hands, and the judgment must be reversed with costs, and judgment rendered by this Court in favor of the appellee for that sum only.

> *Judgment reversed with costs, and*
> *judgment for the appellee for* $100$\frac{15}{100}$.

(Decided 8th January, 1869.)