648 A.2d 453

The **BANK OF GLEN BURNIE**

v.

**LOYOLA FEDERAL SAVINGS BANK.**

**No. 145, Sept. Term, 1993.**

Court of Appeals of Maryland.

Oct. 7, 1994.

Charles W. Ayres, Jr. (John Michael Lis, both on brief), Glen Burnie, for petitioner.

Barkley Clark (C. Lamar Garren, Bruce T. Carton, Piper & Marbury, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and ALAN M. WILNER, Chief Judge of the Court of Special Appeals, Specially Assigned.

CHASANOW, Judge.

We are called upon in this case to decide the issue of who bears the loss, as between the collecting bank and the drawee bank, for an improperly paid check bearing both a forged drawer's signature and a forged indorsement (i.e., a "double forgery"). For the reasons set forth below, we hold that where a drawee bank pays on an instrument bearing both a forged drawer's signature and a forged indorsement, the drawee bank is liable for the loss.

## I.

This case arises out of an action filed in August, 1992, by Richard and Nancy Tinkler in the District Court of Maryland sitting in Anne Arundel County against Loyola Federal Savings Bank (Loyola) and the Bank of Glen Burnie (Glen Burnie) to recover funds that were debited from their account in payment of several checks that turned out to contain forgeries. In 1991, the Tinklers' daughter, Nina Tinkler (Nina), stole a number of blank checks from her parents' home that were drawn on a home equity checking account the Tinklers maintained at Loyola. Between May 13 and May 28, 1991, Nina presented ten of these checks at three different Glen Burnie branches to seven different tellers. Nina signed the checks "Nancy Tinkler" as the drawer, indorsed each check as "Nancy Tinkler," and made the checks payable to "Cash." Glen Burnie cashed the ten checks totalling $5,725.00 and disbursed the cash to Nina.

Glen Burnie's check cashing policy required its tellers to verify a customer's identification by examining the customer's driver's license. Notwithstanding this requirement, there was no indication on the checks that the tellers checked a driver's license to verify the identity of "Nancy Tinkler." When Glen Burnie presented the ten checks to Loyola for payment, Loyola debited the Tinklers' account and reimbursed Glen Burnie for the money paid to Nina. When the Tinklers discovered that the checks had been stolen and forged, they notified Loyola and demanded that the funds be credited to their account.

Glen Burnie and Loyola each denied liability for failing to detect the forgeries, and Loyola refused to credit the Tinklers' bank account. Consequently, the Tinklers filed suit against Loyola and Glen Burnie in the District Court sitting in Anne Arundel County seeking reimbursement from Loyola and Glen Burnie for the banks' improper payments on the forged checks. Loyola and Glen Burnie then filed cross-claims against each other, each alleging that the other was ultimately liable.

The district court held that the Tinklers were not negligent because they "took all reasonable steps that the [c]ourt would expect the parties [to take] ..., to prevent any loss." The court then found Glen Burnie liable for the losses on the checks it cashed, holding that Glen Burnie was in the "best position" to avoid such losses. Pursuant to a Motion to Revise Judgment, the district court entered judgment in favor of the Tinklers against Loyola in the amount of $7,781.00 (which included the $5,725.00 Loyola debited from the Tinklers' account to pay the forged checks and $1,206.00 in interest that had accrued on the Tinklers' home equity loan account because of the payment on the forged checks), with costs plus post-judgment interest, and judgment on Loyola's cross-claim against Glen Burnie in the amount of $5,725.00, with costs plus post-judgment interest.

Glen Burnie appealed to the Circuit Court for Anne Arundel County. The circuit court affirmed the district court, holding

Glen Burnie liable because it was "in the superior position to detect the impropriety." We granted certiorari to address the issue of who bears the loss, as between the collecting bank and the drawee bank, for an improperly paid check bearing both a forged drawer's signature and a forged indorsement, 333 Md. 429, 635 A.2d 976.

## II.

The Uniform Commercial Code (U.C.C.), codified at Maryland Code (1975, 1992 Repl.Vol.), Commercial Law Article, §§ 3–101, *et seq.*,[1] provides for loss allocation in cases of either forged indorsements or forged drawer's signatures. The U.C.C. does not, however, specifically allocate liability in cases where an instrument contains both a forged drawer's signature and a forged indorsement and is paid by both the collecting and drawee banks.[2] *See Perini Corp. v. First Nat. Bank of Habersham County*, 553 F.2d 398, 402 (5th Cir.1977) (noting that the U.C.C. does not provide "the yellow brick road to juridical certainty" in double forgery cases); Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards*, ¶ 15.02[2][c], at S15–9 (3d ed. 1990 & Supp. I 1994) (noting that "[w]here both the drawer's signature and the indorsement are forged, the courts are in a dilemma under the current version of the UCC"); *Payroll Check Cashing v. New*

---

**1.** Unless otherwise specified, all references to §§ 3–101, *et seq.* are to the Maryland Code (1975, 1992 Repl.Vol.), Commercial Law Article.

**2.** The revised version of the U.C.C., which has been adopted by a slim majority of states, applies principles of comparative negligence to allocate loss between the collecting and drawee banks based on the extent to which each bank contributed to the loss. Thus, classification as either a forged indorsement or a forged drawer's signature is not necessary to a determination of loss allocation. *See* Revised §§ 3–404(d) and 3–405(b); *see* Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards*, § 15.02[2][c] (3d ed. 1990 & Supp. I 1994); *see also* 6A Ronald A. Anderson, *Anderson on the Uniform Commercial Code*, [Rev] §§ 3–404:2 and 3–405:2 (3d ed. 1993 & Supp. 1993) (listing states which have adopted the revised version of the U.C.C.). Nevertheless, because the revised version of the U.C.C. has not been adopted in Maryland, our inquiry must be confined to an analysis of the version of the U.C.C. currently codified in Maryland.

*Palestine Bank,* 401 N.E.2d 752, 754 (Ind.Ct.App.1980) (noting that the allocation of loss in a double forgery case depends upon whether the instrument is treated as a forged drawer's signature or a forged indorsement because the U.C.C. does not provide for allocation of loss when a double forgery is involved).

When a drawee bank makes payment on an instrument bearing a forged drawer's signature and a genuine indorsement, the drawee bank is "bound on [its] acceptance and cannot recover back [its] payment." *See* § 3–418 cmt. 1. The traditional justification behind the "finality" rule is that the drawee is expected to know the drawer's signature and has the superior ability to detect a forgery. *See* § 3–418 cmt. 1. The modern justification for the rule is that it is "highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered." *See id.*

In contrast, when a drawee bank makes payment on an instrument bearing a genuine drawer's signature and a forged indorsement, the drawee bank can generally pass liability back to the collecting bank in an action for a breach of the presentment warranty of good title. *See* §§ 3–417(1)(a) and 4–207(1)(a) (prior transferors warrant that they have "good title to the instrument").[3] Because a forged indorsement generally does not confer good title, the drawee bank can recover upstream under a breach of warranty claim "against a[ny] person who presented a check bearing a forged indorsement." *See Perini,* 553 F.2d at 404.

Because the U.C.C. does not expressly provide for the allocation of loss when the collecting bank and the drawee bank pay on an instrument containing *both* a forged drawer's signature and a forged indorsement, we must look to our prior

---

**3.** The warranty under § 3–417(1)(a), which is given by any person, is in all relevant respects identical to the warranty under § 4–207(1)(a), which is given only by bank customers and collecting banks.

cases and to the legislative intent behind the U.C.C. in determining where to allocate liability in a double forgery case.

This Court has had only one occasion to address the issue of where to allocate the loss in a double forgery case. Prior to the adoption of the U.C.C., this Court held in *Com. & Farm. Nat. Bk. v. First Nat. Bk.*, 30 Md. 11 (1869), that the loss in a double forgery case should fall on the drawee bank. In so holding, this Court relied on the principle articulated in *Price v. Neal*, 3 Burr. 1354, 1357 (K.B. 1762), which provided that it is "incumbent upon the [drawee] to be satisfied 'that the bill drawn upon him was the drawer's hand,' before he accepted or paid it ... [,]" to support its conclusion that the drawee bank was liable.

In *Com. & Farm.*, an individual using the probably fictitious name, John S. Hillan, opened an account at Commercial and Farmers National Bank (Commercial) and deposited a check for $4,600.15 purporting to be drawn by Horace Abbott. The presenter signed the signature book "John S. Hillan, No. 504 West Fayette [S]treet," and indorsed the check in the same name. 30 Md. at 16. The following day, the check was sent to the clearing house and subsequently reached the drawee bank, First National Bank (First National), which debited Horace Abbott's account. The person using the name Hillan returned to Commercial on another occasion and withdrew $4,500.00 from his account. 30 Md. at 16–17. Horace Abbott later discovered that the check payable to John S. Hillan was a forgery and notified First National. First National then credited Abbott's account and sued Commercial to recover the money Commercial paid on the forged check. 30 Md. at 17–18.

In holding First National liable on the forged check, this Court first observed that "the drawee is bound to know the handwriting of his correspondent ... and if it pays in mistake a forged check there is no reason why the loss should be shifted to another innocent party...." 30 Md. at 19. This Court summarized its holding by noting that:

"[T]he rule of commercial law, that no title can be acquired through a *forged endorsement,* . . . is no doubt clearly settled, but its very statement shows it can have no bearing on such a case as the present. It pre-supposes a genuine negotiable instrument, the title to which can be transferred by a valid endorsement; but it is a solecism to say, any title can be acquired to that which has in fact no existence . . . and it matters not in such case what may be the form of the forged instrument, whether payable to order or bearer. It is therefore perfectly immaterial to the rights of the parties to this suit whether the name of John S. Hillan, the payee in the check, was a fictitious name inserted by the forger and endorsed thereon by the person who deposited the check with the defendant, or was the genuine name of the criminal thus acting."

30 Md. at 21–22. Thus, pursuant to the holding in *Com. & Farm.,* a drawee bank has the obligation to ensure that the signature of its account holder is genuine and a forged indorsement on an instrument bearing a forged drawer's signature is immaterial, since no indorsement could ever pass title to such an instrument. Although *Com. & Farm.* was decided prior to the enactment of the U.C.C., because the U.C.C. is silent regarding the allocation of liability in double forgery cases and *Com. & Farm.* is the only time this Court has addressed the issue, the decision provides valuable guidance on Maryland legislative intent regarding loss allocation in double forgery cases.

■ The Supreme Court, also in a pre-U.C.C. case, held the drawee bank liable for payment on a check bearing both a forged drawer's signature and a forged indorsement. *See United States v. Chase Nat. Bank,* 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675 (1920). In *Chase,* the finance clerk to a United States Army lieutenant took an official check form and forged both the drawer's signature and the indorsement in the name of the lieutenant, and cashed the instrument at the Howard National Bank (Howard). Howard forwarded the check for collection to Chase National Bank (Chase), who then forwarded it to the drawee, the Treasurer of the United States. Two

weeks after the Treasurer paid on the instrument, it discovered the forgery and demanded repayment. 252 U.S. at 493, 40 S.Ct. at 362, 64 L.Ed. at 678. In holding the United States Treasury liable for the loss, the Court stated that the fact that the indorsement was also forged does not prevent application of the *Price v. Neal* rule which binds a drawee bank to its acceptance once it pays on a forged drawer's signature. *See Chase*, 252 U.S. at 495, 40 S.Ct. at 363, 64 L.Ed. at 679–80. The Court concluded by noting that "[t]he forged indorsement puts [the drawee] in no worse position than he would occupy if [the signature] were genuine. He cannot be called upon to pay again and the collecting bank has not received the proceeds of an instrument to which another held a better title." *Chase*, 252 U.S. at 496, 40 S.Ct. at 363, 64 L.Ed. at 680.

Following the enactment of the U.C.C., several courts in other jurisdictions have had occasion to decide the liabilities of the respective parties in double forgery cases. These case holdings are consistent with pre-U.C.C. cases holding the drawee bank liable in double forgery cases. The seminal case addressing the allocation of liability in double forgery cases treats the double forgery as a forged drawer's signature situation and places liability for the improper payment on the drawee bank. *See Perini, supra.*

Perini Corporation was a large construction company which utilized a facsimile signature machine for writing its large volume of checks. *Perini*, 553 F.2d at 400. A number of Perini's checks were stolen and the thief either gained access to the signature machine or made a perfect copy of the facsimile signature. *Perini*, 553 F.2d at 401. The facsimile signature on the forged checks was indistinguishable from the signature that was on file at the drawee banks. The stolen checks were subsequently deposited at the Habersham Bank into the account of "Quisenberry Contracting Co." and a signature card was signed in the forged or fictitious name, "Jesse D. Quisenberry." *Id.* Another account was also opened at Habersham in the name of "Southern Contracting Co." and the depositor again signed "Jesse D. Quisenberry" on

the signature card. Perini checks totalling over one million dollars were deposited into the accounts. Habersham stamped each check "P.E.G." to guarantee the prior indorsement, and forwarded the checks to Fulton National Bank of Atlanta (Fulton) for collection. *Id.* Fulton then sent the checks to the drawee banks, Brown Brothers, Harriman & Company (Brown Brothers) and Morgan Guaranty Trust Company of New York (Morgan), both of whom paid the checks. *Id.* After discovering the forgeries, Perini sued Morgan, Fulton and Habersham to recover the monies paid out to the depositor. *Perini,* 553 F.2d at 402. By this time, the depositor had withdrawn almost all of the monies in the account. *Perini,* 553 F.2d at 401.

In assessing liability, the *Perini* court relied on the U.C.C.'s finality rule of § 3–418 to hold that a double forgery case must be treated as a forged drawer's signature case and the drawee bank must suffer the loss when it pays on an instrument bearing both a forged indorsement and a forged drawer's signature.[4] *See Perini,* 553 F.2d at 417. One author summarized the *Perini* holding as follows:

> "The *Perini* case ... stands for the proposition that double forgeries will be treated as forged drawer's signature cases, not forged indorsement cases.... If there is no 'intended payee,' the case should not be cast as a forged indorsement case."

Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards,* ¶ 805[1], at 8–207 (3d ed. 1990). Subsequent judicial decisions also treat double forgeries as forged drawer's signature cases and impose liability solely on the drawee bank. *See Cumis Insurance Society, Inc. v. Girard Bank,* 522 F.Supp. 414, 419 (E.D.Pa.1981); *Winkie v. Heritage Bank of*

---

**4.** Although the *Perini* court held that the drawee bank must suffer the loss in a double forgery case, Perini had no recourse against the two drawee banks because of a resolution authorizing the drawee banks to pay checks bearing the facsimile signature of "R.A. Munroe" and absolving those banks of any liability for paying on such instruments. *Perini Corp. v. First Nat. Bank of Habersham County,* 553 F.2d 398, 403 (5th Cir.1977).

*Whitefish Bay,* 299 N.W.2d 829, 836–37 (Wis.1981); *Brighton, Inc. v. Colonial First Nat'l Bank,* 176 N.J.Super. 101, 422 A.2d 433, 440 (Ct.App.Div.1980), *aff'd,* 86 N.J. 259, 430 A.2d 902 (N.J.1981).

Section 3–418, relied on by the *Perini* court, provides that "except for liability for breach of warranty on presentment under [§ 3–417], payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." [5]

Section 3–418's finality rule is the codification of the common law rule established by the King's Bench of England in *Price v. Neal,* 3 Burr. 1354 (K.B. 1762), which provided that once a drawee bank improperly pays a check bearing a forged drawer's signature, the drawee bank is bound by its acceptance and cannot recover back its payment. 3 Burr. at 1357. The finality rule also corresponds with the policy of encouraging finality in commercial transactions involving checks. *See* § 3–418 cmt. 1 (stating that "it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered"); *Com. & Farm.,* 30 Md. at 22 (stating that the "safest rule for the commercial public, as well as that most consistent with justice, is to allow the loss to remain where by the course of business it has been placed [on the drawee bank]").

In the instant case, Loyola initially asserts that Glen Burnie is not protected by the finality rule because the rule is expressly subordinate to a claim for a breach of the presentment warranty of good title under § 3–417. Section 3–

---

5. Contrary to the circuit court's holding in the instant case that the party in the "best position to prevent the loss" should be liable, the negligence standard which served as the basis for that holding has specifically been rejected by the version of the U.C.C. codified in Maryland. *See* § 3–418 cmt. 4 (noting that the holder's negligence does not affect the finality of payment—only if the holder is not a holder in due course is the finality of payment affected). Thus, the presence or absence of negligence on the part of Glen Burnie is irrelevant in determining whether § 3–418 is applicable to the instant case.

417(1)(a) provides that "any prior transferor warrants to a person who in good faith pays or accepts that . . . [h]e has good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title." Loyola argues that Glen Burnie breached this presentment warranty because forged indorsements cannot convey good title. Thus, Loyola asserts that it may recover the monies it paid on the forged checks from Glen Burnie based on a claim for breach of the presentment warranty of good title and Glen Burnie is precluded from invoking § 3–418 as a defense to Loyola's breach of presentment warranty claim. We disagree.

Courts have stated that § 3–417's warranty of title "is nothing more than an assurance that no one has better title to the check than the warrantor, and therefore, that no one is in a position to claim title as against the warrantee, as the payee or other owner of a genuine check could do if his endorsement were forged." *Perini*, 553 F.2d at 415 (quoting *Aetna Life and Casualty Co. v. Hampton State Bank*, 497 S.W.2d 80, 84 (Tex.Civ.App.1973)). Unlike instruments containing only a forged indorsement in which a named payee will come forward with a valid claim of superior title to the instrument, when an instrument contains a double forgery, because both the drawer's signature and the indorsement are forged, no valid payee or drawer can come forward with a superior claim of title. Thus, in double forgery cases, because no party has better title to the instrument, no breach of presentment warranty exists. *See, e.g., Brighton, Inc. v. Colonial First Nat'l Bank*, 176 N.J.Super. 101, 422 A.2d 433, 441 (Ct.App.Div.1980), *aff'd*, 86 N.J. 259, 430 A.2d 902 (N.J.1981) (noting that "[t]he normal hazard encountered in honoring a check bearing the forged indorsement of the payee[,] . . . that the forger will be paid, and when the true payee comes forth, his debt will have to be paid" does not exist in double forgery cases). Applying the above analysis to the instant case, Glen Burnie did not breach the warranty of good title because no party exists who can

assert better title to the instrument due to the forged drawer's signature.[6]

In addition, the warranty of title merely guarantees that the instrument contains all "necessary" indorsements and that those indorsements are deemed effective. *See Fireman's Fund Ins. v. Sec. Pac. Nat. Bank,* 85 Cal.App.3d 797, 809–10, 149 Cal.Rptr. 883, 892 (1978), and *Longview Bank & Trust v. First Nat. Bank,* 750 S.W.2d 297, 298 (Tex.Ct.App.1988) (both noting that the warranty of good title guarantees that all necessary indorsements are deemed effective). Given that the instruments in the instant case were all bearer paper requiring *no* indorsements to transfer good title, *see* §§ 3–111 and 3–202, the forged indorsement cannot establish a breach of presentment warranty in this case because the instrument contained all "necessary" indorsements.

Although Glen Burnie has not breached the presentment warranty of good title, to enable it to qualify for protection under § 3–418's finality rule, it must either be a holder in due course of the instrument or be a party who in good faith changed its position in reliance on Loyola's payment.[7] As discussed below, Glen Burnie qualifies as a holder in due course and is entitled to protection under the finality rule. To

---

6. We note that in a case when an intermediary bank presents the checks to the drawee bank and the drawee bank subsequently refuses payment based on the forged drawer's signature, the intermediary bank would be able to pass liability upstream pursuant to an action for breach of the transfer warranty under §§ 3–417(2)(b) and 4–207(2)(b) because all of the signatures on the instrument were not genuine. The transfer warranty under §§ 3–417(2)(b) and 4–207(2)(b) does not run to the drawee bank. *See Payroll Check Cashing v. New Palestine Bank,* 401 N.E.2d 752, 756 (Ind.Ct.App.1980); *see also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 15–9, at 773 (3d ed. 1988).

7. Glen Burnie did not change its position in reliance on the final payment from Loyola because Glen Burnie paid cash on all ten checks *before* Loyola made final payment. *See Fireman's Fund Ins. v. Sec. Pac. Nat. Bank,* 85 Cal.App.3d 797, 822–23, 149 Cal.Rptr. 883, 900 (1978) (noting that "[t]he determinative fact regarding the issue of reliance is not that the bank gave value, but rather that it changed its legal position only *after* knowledge of payment by [the drawee bank]") (emphasis added). Thus, Glen Burnie cannot qualify for protection under the finality rule as a party who changed its position in reliance on Loyola's final payment.

qualify as a holder in due course, Glen Burnie must be a holder who takes the instrument for value, in good faith and without notice that there is any defense or claim against it. *See* § 3–302. One can become a holder through proper negotiation of an instrument. *See* § 3–202(1). In the case of order paper, proper negotiation is effected by delivery along with any necessary indorsement. In contrast, proper negotiation of bearer paper is effected merely by delivery of the instrument. *Id.* Contrary to Loyola's suggestion that the checks at issue were order paper, all of the checks were made payable to "Cash" and are therefore bearer paper as defined by § 3–111. Given that the checks were bearer paper, the only condition necessary to make Glen Burnie a holder is delivery. § 3–202. There is no dispute that the checks were delivered to Glen Burnie. Thus, Glen Burnie was a holder of the checks.[8] The next inquiry is whether Glen Burnie took the checks for value. Section 3–303 provides that "[a] holder takes the instrument for value . . . [t]o the extent that the agreed consideration has been performed." Glen Burnie performed the agreed upon consideration when it paid cash to Nina on each of the ten checks. Thus, it took the instruments for "value." *See also* § 4–209.

Given that Glen Burnie is a holder who took the checks for value, the remaining inquiry is whether Glen Burnie took the checks in good faith and without notice to qualify it as a holder in due course. Section 1–201(19) defines good faith as "honesty in fact in the conduct or transaction concerned." There is no indication in the record in the instant case that Glen Burnie

---

8. We note that in this case, Glen Burnie asked Nina Tinkler to indorse the checks. This indorsement, however, was not necessary in that it did not take the instrument out of the definition of bearer paper and did not prevent Glen Burnie from becoming a holder. The indorsement requested by Glen Burnie was merely for its own protection. It was not required to duly negotiate the instrument. *See* 1 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 13–9, at 640 (3d ed. 1988) (stating that "[a]lthough a party need not indorse bearer paper in order to make his transferee a holder, most persons taking a bearer instrument demand an indorsement from the transferor in order to assure themselves of his identity and to gain the benefit of the indorsement contract").

did not act honestly when it cashed the checks bearing the forged indorsements. Furthermore, there is no indication in the record that anyone employed at Glen Burnie believed they were cashing forged instruments. Thus, because the record provides no indication that Glen Burnie lacked "honesty in fact" when it cashed the checks, Glen Burnie acted in good faith. *See, e.g., Aetna,* 497 S.W.2d at 87–88 (holding that the bank exercised good faith because the record failed to show a lack of honesty in handling the transaction or a belief that the check was forged). With regard to notice, given that the checks were not overdue, there was no notice of dishonor, and there were no alterations, Glen Burnie was without notice that there was a claim or defense against the checks. *See* § 3–302. Because Glen Burnie fulfills the necessary prerequisites to qualify as a holder in due course, it is entitled to invoke the protections of the finality rule of § 3–418 to preclude Loyola from recovering against it.

### III.

Although the issue may not be presented in the instant case, we should point out that even if the lower courts were correct in assuming that the checks at issue in this case were order paper requiring an effective indorsement to confer holder status, the forged indorsements arguably could be considered "effective" to confer holder status upon Glen Burnie through application of the fictitious payee rule of § 3–405. Section 3–405 provides that "[a]n indorsement by any person in the name of a named payee is effective if . . . [a] person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument. . . ." This section was based on the assumption that because the forger made the instrument payable to a fictitious payee or a payee not intended to have an interest in the check, the check was in effect made payable to bearer requiring no indorsement for negotiation. *See* Donald W. Baker, *The Perini Case: Double Forgery Revisited (Part I),* 10 UCC L.J. 309, 327 (1978). Thus, pursuant to the fictitious payee rule, a forged indorsement on an order instrument with a forged drawer's signature

may be considered effective and title to the instrument passes as if no forged indorsement existed. *See Brighton,* 422 A.2d at 439; *Aetna,* 497 S.W.2d at 84 (noting that the fictitious payee rule renders the indorsement "effective" for purposes of conferring holder status). Thus, negotiation is achieved such that the collecting bank is a holder because all *"necessary"* indorsements are present and effective. *See* § 3–202.[9]

Applying the fictitious payee rule of § 3–405(1)(b) to a double forgery of order paper would render the "forged" indorsement effective for purposes of holder in due course status. Holder in due course status will then enable the collecting bank to seek protection under the finality rule of § 3–418 and place liability solely on the drawee bank for improperly paying an instrument bearing a forged drawer's signature. If in the instant case the instruments in question had in fact been order paper, by application of the fictitious payee rule, the forged indorsement of Nancy Tinkler would be considered "effective." Holder status would therefore be conferred upon Glen Burnie to permit it to utilize the finality rule of § 3–418 and Loyola would be unable to recover against Glen Burnie.

We also note that by rendering the indorsement "effective" through application of the fictitious payee rule of § 3–405(1)(b), no warranty of title would be breached because the "necessary" indorsement is deemed effective. *See* § 3–405. As discussed, *supra,* the warranty of title merely guarantees that an instrument contains all "necessary" indorsements and

---

9. Loyola argues that the fictitious payee rule does not apply to situations where the drawer was not authorized to draw on the account. The express language of § 3–405(1)(b), however, does not seem to limit its applicability to situations where the person was authorized to draw on the account. Several courts have held the fictitious payee rule applicable to double forgery situations where the forger did not have authorization to draw the check and no employer/employee relationship was present. *See Aetna Life and Casualty Co. v. Hampton State Bank,* 497 S.W.2d 80, 84 (Tex.Civ.App.1973) (applying the fictitious payee rule in a double forgery case where the person was an unknown wrongdoer because the forger signed " 'as or on behalf of' the drawer, within § 3–405"); *see also Perini,* 553 F.2d at 409 n. 14 (noting that "[n]othing in § 3–405(1)(b) limits its application" to authorized drawer situations).

that those indorsements are deemed effective. *See Fireman's Fund*, 85 Cal.App.3d at 810–11, 149 Cal.Rptr. at 892; *Longview Bank & Trust*, 750 S.W.2d at 298–99. Thus, the fictitious payee rule could render the indorsements in the instant case "effective" even if the instruments were order paper, and if so, no breach of warranty claim could be maintained by Loyola. *See also* Donald W. Baker, *The Perini Case: Double Forgery Revisited (Part II)*, 11 UCC L.J. 41, 62 (1978) (noting § 3–405(1)(b) not only serves to remedy the defect for purposes of holder in due course status under the final payment rule, but also renders the indorsement effective for title warranty purposes).

## IV.

We should also point out that, although the finality rule establishes Loyola's liability in the instant case, several courts have also utilized a theory known as the "loss-causation" rule to justify placing the loss on the drawee bank in double forgery cases. The "loss-causation" rule confers holder status on collecting banks thereby denying drawee banks the ability to raise any forged-indorsement related claims. *See Perini*, 553 F.2d at 414; *Aetna*, 497 S.W.2d at 84; *Nat. Credit Union Admin. v. Mich. Nat. Bank*, 771 F.2d 154, 159–60 (6th Cir. 1985); *Cumis*, 522 F.Supp. at 419; *Winkie*, 299 N.W.2d at 836; *Brighton*, 422 A.2d at 440–41. The loss-causation rule is based on the assumption that any loss resulting from improper payment on an instrument bearing a double forgery is the result of the drawee bank's payment on a forged drawer's signature where no payment was intended by the drawer. *See Perini*, 553 F.2d at 415. Thus, the loss-causation rule prohibits forged indorsement-related claims by the "drawee against collecting banks for breach of warranty." *See* Baker, *The Perini Case: Double Forgery Revisited (Part II)*, 11 UCC L.J. at 51. Professor Baker explains the loss-causation rule as follows:

"The conclusion that in double forgery situations the ... drawer or drawee suffers no loss attributable to the forged indorsement because no payee can appear with a rightful

claim can be explained as follows: In a single forgery situation in which only the indorsement is forged, the drawer will have validly drawn the check intending the named payee to receive the proceeds in exchange for some consideration given by the payee. When a thief steals the check and forges the payee's indorsement, the payee of course does not receive the proceeds. The thief passes the check to a collecting bank, which forwards it to the drawee, which in turn pays it and debits the drawer's account. At the time the theft is discovered, all parties except the payee are in a neutral position: The collecting bank has paid the forger, but has been paid in turn by the drawee; the drawee has paid the collecting bank, but has in turn debited the drawer's account; and the drawer has lost the amount from his account, but has received the consideration from the payee. Only the payee, who has given consideration but has not received the proceeds, is in a negative position. The payee has the ability to make himself whole either by recovering against the drawer on the underlying transaction or by recovering against the drawee for conversion. Thus, the loss suffered by the drawer or drawee can be attributed to the forged indorsement, in the sense that the theft and forgery resulted in the appearance of a payee with a rightful claim.

By contrast, in double forgery situations the drawer's signature, as well as the indorsement, is forged, meaning that the check was never validly drawn to a payee entitled to payment. Hence no true payee can appear with a claim against the drawer or drawee, and neither of the latter parties can be said to suffer a loss attributable to the forged indorsement. Rather, the loss results from the drawee's making payment over a forged drawer's signature where none was intended by the drawer."

Baker, *The Perini Case: Double Forgery Revisited (Part II)*, 11 UCC L.J. at 54–55; *see also Winkie*, 299 N.W.2d at 837; *Perini*, 553 F.2d at 415 (stating that the loss resulted from "the drawees' paying checks to which [the drawer's] name was forged"); *Nat. Credit Union*, 771 F.2d at 159 (noting that

"regardless of whether the indorsement is forged, fails to show representative capacity, or is altogether missing—the defect does not cause the ... loss") (citations omitted); *Brighton*, 422 A.2d at 440–41 (noting that in double forgery cases the "[l]oss accrued only when the customer's account was debited by the drawee bank, not when the forger collected on his indorsement"). The court in *Brighton*, went on to state that:

> "In the typical double forgery case, neither the ostensible drawer ... nor the collecting bank will be called upon to pay again the payee.... In the double forgery situation, the loss need only be paid once, and it is the drawee bank's loss because payment was made of an item not properly payable...."

422 A.2d at 441.

Loyola contends that the instant case is distinguishable from other cases which utilized the loss-causation rule to place liability on the drawee bank because in the instant case Glen Burnie immediately cashed the checks as opposed to accepting them for deposit and awaiting the drawee's payment before releasing the funds. Loyola concedes that when a collecting bank accepts a check bearing a forged indorsement for deposit and does not release the funds until the drawee bank's final payment that the drawee's final payment causes the loss because it effectively releases the deposited funds to the forger/depositor. However, Loyola argues that the loss in the instant case was caused by Glen Burnie because Glen Burnie cashed the checks containing the forged indorsements without waiting to see if the Tinklers' account was debited. We disagree. The Tinklers' account was debited only after the checks reached Loyola, not when the checks were cashed by Glen Burnie. *See* § 4–213(1)(c) (final payment occurs when the drawee bank completes "the process of posting the item to the indicated account of the drawer"); *see, e.g., Brighton*, 422 A.2d at 441 n. 6 (noting that when a bank cashes an instrument bearing a forged indorsement, it pays out of its own funds). Thus, the fact that Glen Burnie cashed the checks, as opposed to accepting them for deposit, does not serve to

distinguish the instant case from other cases holding the drawee bank liable under the loss-causation rule because in both situations, the drawer's account was not debited until the drawee bank paid on the forged drawer's signature.

## V.

In conclusion, because Glen Burnie has met all the prerequisites necessary to invoke the protections of the finality rule of § 3–418, Loyola must suffer the loss. *See Perini*, 553 F.2d at 414–15. This conclusion is in accord both with this Court's holding in *Com. & Farm.*, that a drawee bank should not be able to pass liability on to another party for its failure to detect a forgery of its own drawer's signature and with the overwhelming weight of authority from other jurisdictions holding the drawee bank liable for the loss in double forgery cases. *See* Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards,* ¶ 8.05[2], 8–209 (3d ed. 1990 & Supp. I 1994) (noting that "there are no solid decisions imposing indorsement liability in double forgery situations"); 6 Jeffrey B. Reitman, Harold Weisblatt et al., *Banking Law: Checks, Drafts and Notes,* § 129.03, at 129–6 (1985) (noting that in the case of a double forgery, "the decisions under the [U.C.C.] have all held the drawee bank ultimately liable").

We hold that in a case of double forgery, as between the collecting bank that cashed the check and the drawee bank that has honored the check, the drawee bank is liable for the loss.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION, COSTS TO BE PAID BY RESPONDENT LOYOLA FEDERAL SAVINGS BANK.*