773 A.2d 1064

**Luiz R.S. SIMMONS**

v.

**Michael LENNON.**

**No. 2905, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 6, 2001.

Paul F. Riekhof (Joseph, Greenwald & Laake, P.A., on brief) Greenbelt, for appellant.

Benjamin Wolman and Lynae T. Turner, Marlboro, for appellee.

Argued before DAVIS, SALMON and JAMES R. EYLER, JJ.

SALMON, Judge.

Beginning sometime in 1995 and continuing into early 1998, a secretary and a bookkeeper conspired with one another to defraud their employer, Luiz R.S. Simmons, Esq., of funds he kept in his escrow accounts and in his general office accounts. As a consequence of their scheme, Simmons's signature was forged on numerous checks, and large sums of money were withdrawn from his accounts without his knowledge.

One of the checks forged by Simmons's secretary was in the amount of $13,000 and was made payable to Michael Lennon ("Lennon"), who sold a vehicle to the secretary and received the forged check in partial payment for the vehicle. According to Simmons, Lennon knew, or should have known, that the check was forged when he accepted it.

In this case, we are called upon to decide two issues: (1) whether, under either the Uniform Commercial Code or Maryland common law, the payee of a check bearing the forged signature of the drawer can be successfully sued by the drawer for conversion of the check and (2) whether the payee of a check, who knows or should have known that the check bears the drawer's forged signature, owes a duty, which will support a cause of action sounding in negligence, to warn the drawer that his signature has been forged. Like the trial judge below, we answer both questions in the negative.

## I.  *FACTS* [1]

In 1993, Luiz Simmons hired Michelle Campbell as a receptionist at his Silver Spring, Maryland, law office.  She later became Simmons's secretary.  After Ms. Campbell was hired, she formed an acquaintanceship with Simmons's outside bookkeeper, Denise Evans, who kept track of funds in Simmons's office and escrow accounts.  Neither Ms. Campbell nor Ms. Evans was authorized to sign checks drawn on any of Simmons's accounts—Simmons alone had check signing authority.

At all times here relevant, Ms. Campbell's responsibility included keeping Simmons's check register accurate and making deposits into his accounts.  Ms. Campbell began in 1995 to forge Simmons's name to checks drawn on several of her employer's accounts. Because Ms. Evans was a participant in the scheme and because Simmons trusted his employees, Ms. Campbell's forgeries went undetected by Simmons for over two years.

Appellee, Michael Lennon, is a retired Prince George's County police officer.  At one time Ms. Campbell was Lennon's live-in girlfriend.  While residing with Lennon, Ms. Campbell forged Lennon's name to several credit card application forms resulting in her receipt of credit cards from four companies.  The cards were issued in Lennon's name.  Ms. Campbell proceeded to use the credit cards to fraudulently accumulate over $17,000 in credit card debt in Lennon's name. In March 1994, Lennon discovered that Ms. Campbell had forged his name to the credit card applications.  He reported the matter to the credit card companies and to the police.  In 1994, Ms. Campbell was convicted of fraud based on her forgery of Lennon's name on the credit card applications.

Ms. Campbell introduced Mr. Lennon to Simmons sometime in 1994.  Thereafter, Lennon periodically worked as a private process server for Simmons.  As a consequence of his work as

---

1.  Solely for the purposes of the summary judgment motion, the parties accepted the facts set forth in Part I, above, as true.  It seems likely that, if this matter were to be presented to a jury, Lennon would dispute at least some of these facts.

a private process server, Lennon saw Simmons fairly frequently—and the two enjoyed a cordial relationship.

In October 1996, at a point when Lennon was still friendly with Ms. Campbell but was no longer romantically involved with her, Lennon agreed to sell Ms. Campbell his Chevrolet Blazer for $22,000. Ms. Campbell paid for the vehicle with a $9,000 check, which represented the proceeds of a bank loan, and a separate $13,000 check, payable to Lennon, drawn on an escrow account Simmons held at NationsBank. Simmons's signature on the $13,000 check was forged by Ms. Campbell. Lennon cashed the two checks and transferred title to the Blazer to Ms. Campbell in late October 1996.

In early February 1998, which was more than fifteen months after the sale of the Chevrolet Blazer, Simmons discovered that Ms. Campbell, with the aid of Ms. Evans, had been embezzling funds from his accounts for over two years. In the period after the $13,000 check was forged, scores of checks, totaling $109,362, were cashed by Ms. Campbell after she had forged Simmons's signature as the drawer of those checks.

## II. *COMPLAINT AND PROCEEDINGS*

Simmons filed a complaint against Lennon in the Circuit Court for Prince George's County on June 8, 1998. He asked for a jury trial. One count in his complaint was for conversion and related solely to the $13,000 check. Another count was for negligence.[2]

On the morning of trial, Simmons, representing himself, made an opening statement, as did counsel for Lennon. Simmons then began his testimony, but shortly after his testimony commenced, Judge Stephen I. Platt told Simmons, out of the presence of the jury, that he had grave doubts as to whether he could prevail even if everything he had said in his testimony and in his opening statement were believed by the jury.

---

**2.** The complaint also included a count for restitution. That count was voluntarily dismissed by Simmons.

Specifically, in regard to the negligence count, the trial court said he doubted that Lennon had breached any duty owed to Simmons. He invited Simmons to try to convince him otherwise.

Simmons argued that Lennon, on the date he received the $13,000 check, had a duty to notify him that Campbell had forged his name to the escrow account check. According to Simmons, if Lennon had not breached that duty, he would have fired Campbell immediately, and her forgeries would have stopped. And, if the forgery scheme had been terminated at that point, the loss of $109,362 would have been avoided. In addition, the $13,000 check would not have been paid by NationsBank. Simmons based his allegation that Lennon "knew or should have known" that the check he received was forged upon the following facts:

1. The words "escrow account" were printed on the NationsBank check that Lennon received;

2. Lennon, who obtained a Florida real estate license in 1985, knew or should have known that it was impermissible for an attorney to pay for an employee's motor vehicle out of an escrow account; [3]

3. Lennon, due to the fact that he served private process for Simmons, was familiar with Simmons's signature;

4. The signature on the $13,000 check did not look like Simmons's signature; and

5. Based on the fact that Campbell had been convicted of fraud due to her forgery of Lennon's name on forged credit card applications, Lennon knew that Campbell was a person likely to forge checks.

At the trial judge's invitation, and with Simmons's acquiescence, Lennon's counsel then moved for summary judgment as to both counts. The parties agreed that Judge Platt should

---

3. The $13,000 escrow check did not reveal the name of the person for whose benefit the monies were being held in escrow. Simmons did not say how Lennon would have known that the money was not held in escrow for Campbell.

decide the motion based on the assumption that all statements of facts in the complaint, together with all statements of facts set forth in either Simmons's opening statement or in his trial testimony, were truthful.

Judge Platt ruled that the facts relied upon by Simmons were insufficient to support a cause of action for conversion. He also ruled that Simmons could not recover against Lennon on the negligence count because Lennon owed Simmons no duty to warn him that Campbell had forged an escrow check.

## III.  *ANALYSIS*

### A.  *The Conversion Count*

Simmons argues:

Granting summary judgment on the conversion count was improper because the [d]efendant's acceptance for value of the stolen and forged checks [sic] and subsequent receipt of the underlying proceeds wrongfully deprived the [p]laintiff of the proceeds [in] his Attorney Escrow Account.

### 1.  The Uniform Commercial Code (1996 Version)

Because the $13,000 check received by Lennon was a negotiable instrument, we must first look to the Uniform Commercial Code to determine whether Lennon's actions concerning the $13,000 check constituted a conversion of it.  In October 1996, when Lennon cashed the check, the Maryland legislature had recently revised the Uniform Commercial Code in several significant respects, but the effective date of the revision was January 1, 1997.  1996 M. Laws, Chap. 91 § 2. As of October 1996, Simmons's rights and Lennon's liability were governed by the Uniform Commercial Code (U.C.C.) codified at section 3–101 *et seq.* of the Commercial Law article of the Maryland Code (1975, 1992 Repl.Vol.).[4]

---

4. All references to the U.C.C. in Part III A are to sections in effect in October 1996.

Section 3–301 *et seq.* of the U.C.C. provides for loss alloca-
tion in cases of forged drawers' signatures. *Bank of Glen
Burnie v. Loyola Fed. Sav. Bank,* 336 Md. 331, 336, 648 A.2d
453 (1994). NationsBank, the drawee, which held the monies
in Simmons's escrow account, ordinarily would have had no
right to deduct the amount of the check from the drawer's
(Simmons's) account because the drawer's signature was
forged. NationsBank nevertheless paid the $13,000 check.
The payee's signature (Lennon's) was not forged. Under such
circumstances, usually the drawee bank would be liable to the
drawer and would be required to re-credit the drawer's ac-
count.[5]

---

**5.** This does not necessarily mean, however, that the drawer whose
signature is forged can *always* recover against the drawee bank. The
drawee bank does not have to recredit the account if the drawer ratifies
the forgery or (in some cases) negligently contributed to it or fails to act
with reasonable promptness. *See* John D. O'Malley, *Common Check
Frauds and the Uniform Commercial Code* 23 Rutgers L.Rev. 189, 199–
201 (1969), where the author says:

Incorporating various principles of case and statutory law in the
definition of the drawer's obligations in section 4–406 (Customer's
Duty to Discover and Report Unauthorized Signature or Alteration),
the [U.C.C.] affirms that the *drawer must exercise reasonable care and
promptness in discovering and reporting forgeries or alterations.* Yet,
even if the depositor fails to exercise such care, the loss will not be
shifted from the bank to him unless the bank can establish that it has
sustained a loss by reason of that failure *and is itself free from
negligence.* Quite apart from any concept of negligence, however, are
the provisions of the Code which *prescribe certain maximum or
absolute time periods within which such notice of forgery or alteration
must be given.* The drawer is precluded from asserting against the
bank a forgery of his signature or an alteration unless he gives notice
within 1 year after the statement and cancelled checks are available
or, in the case of a *forged indorsement,* unless notice is given within 3
years.

Subordinating the "reasonable care and promptness" provisions to
these absolute time periods in the Code has elicited criticism for
several reasons. Arguably, risk distribution based upon negligence is
thwarted in that even a careless bank will not be liable to the drawer
when the time periods have expired. Considering the defensibility of
the lengths of the time periods, the 1–year limitation for notice of a
forged signature or an alteration corresponds in intent with, and is
more liberal than prior statutory law, but the 3–year limitation for
notice of a forged indorsement clearly adopts the minority view. *It
should be noted also that the time limitations for notice apply only
between the drawer and his bank. Any action by the drawer against
another party,* or by the payee or other owner of a forged check

■   Under the U.C.C., as it read prior to January 1, 1997, a drawer could not successfully sue a payee, such as Lennon, for the conversion of a check paid on the drawer's forged signature. *See* U.C.C. § 3–419(1), which read:

Conversion of instrument; innocent representative.

(1) An instrument is converted when

(a) A drawee to whom it is delivered for acceptance refuses to return it on demand; or

(b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it; or

(c) It is paid on a forged indorsement.

As can be seen, section 3–419(1)(a) and (b) have no application to this case. Section 3–419(1)(c) is likewise inapplicable because the $13,000 check that Lennon cashed was not paid on a forged indorsement—it was paid on a forged drawer's signature, but the indorsement by Lennon was genuine. The "Code distinguishes between forgeries of drawers' signatures and forgeries of indorsements." *See* George D. Triantis, *Allocation of Losses from Forged Indorsements on Checks and the Application of § 3–405 of the Uniform Commercial Code,* 39 Okla. L.Rev. 669, 669 (1986); *see also Perini Corp. v. First Nat'l Bank of Habersham County,* 553 F.2d 398, 404 (5th Cir.1977) (when drawee bank pays check on forged indorsement it may generally pass liability back through the indorsement chain, whereas with forged drawer's signatures, drawee bank remains liable).[6]

---

against the drawer, drawee bank, or collecting bank, or by the banks against parties liable to them is *subject to the ordinary state statute of limitations* governing actions on negotiable instruments. Despite the objections to the absolute time limitations of section 4–406, to say nothing of the many pleas to keep uniform laws uniform, and as if for no other reason than to prove that the law's mind remains subject to change, a number of states in adopting the Code modified the time periods by reducing them still further.

(Emphases added) (footnotes omitted).

**6.** In *Sony Corp. of Am. v. American Express Co.,* 115 Misc.2d 1060, 455 N.Y.S.2d 227, 230 (Civ.Ct.1982), the court explained:

As a general rule, under this section [3–419(1)(c) ], a *payee* clearly has a cause of action against a drawee bank (White & Summers, Uniform

The Court of Appeals recognized this distinction in *Bank of Glen Burnie*.

When a drawee bank makes payment on an instrument bearing a forged drawer's signature and a genuine indorsement, the drawee bank is "bound on [its] acceptance and cannot recover back [its] payment." *See* § 3–418 cmt. 1. The traditional justification behind the "finality" rule is that the drawee is expected to know the drawer's signature and has the superior ability to detect a forgery. *See* § 3–418 cmt. 1. The modern justification for the rule is that it is "highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered." *See id.*

In contrast, when a drawee bank makes payment on an instrument bearing a genuine drawer's signature and a forged indorsement, the drawee bank can generally pass liability back to the collecting bank in an action for a breach of the presentment warranty of good title. *See* §§ 3–417(1)(a) and 4–207(1)(a) (prior transfers warrant that they have "good title to the instrument"). Because a forged indorsement generally does not confer good title, the drawee bank can recover upstream under a breach of warranty claim "against a[ny] person who presented a check bearing a forged indorsement." *See Perini*, 553 F.2d at 404.

336 Md. at 337, 648 A.2d 453 (footnote omitted).

Based on the facts proffered by Simmons, his check was not "converted" by Lennon within the meaning of the U.C.C.

---

Commercial Code, [2d ed], § 15–4, p 586; *Forman v. First Nat. Bank of Woodridge*, 66 Misc.2d 432, 320 N.Y.S.2d 646; *Ahrens v. Westchester Fed. Sav. & Loan Assn.*, 58 A.D.2d 799, 396 N.Y.S.2d 246). In contrast, the drafters of the Uniform Commercial Code did not intend that a drawer have a conversion action against the drawee bank. Comment 3 to section 3–419 (subd [a], par [c] ) refers to the rights of the owner, i.e., the payee, not the drawer. (See *Stone & Webster Eng. Corp. v. First Nat. Bank & Trust Co. of Greenfield*, 345 Mass. 1, 184 N.E.2d 358 [*drawer does not possess right of payee to present check to drawee bank and therefore may not sue in conversion*].)
(Emphasis added.)

because it was not paid on a forged indorsement, nor was any other provision of section 3–419(1) applicable.

Simmons disagrees and contends that Judge Platt erred in granting summary judgment on the conversion count. He supports his argument by relying on two New York cases, *viz: Sales Promotion Executives Association v. Schlinger & Weiss, Inc.,* 234 N.Y.S.2d 785 (Civ.Ct.1962), and *Stockton v. Gristedes Supermarkets, Inc.,* 177 A.D.2d 425, 576 N.Y.S.2d 267 (App.Div.1991).

In the *Sales Promotion Executives Association* case, an employee of the *payee* stole forty-nine checks from the payee and, over a course of nine months, cashed them at the defendant's supermarket. 234 N.Y.S.2d at 786. On each of the checks, the dishonest employee *signed the payee's* name and then wrote his own name underneath. *Id.* The court opined:

> Normally, a corporation-payee deposits it[s] checks in its bank account. It is unusual for a corporate-payee to cash a check or endorse it over to a third person. Therefore, when a person is asked to cash a check which bears the purported endorsement of a corporate-payee, he should be placed on guard. He should check to see whether the endorsement is authentic and whether the person attempting to cash the check is authorized so to do by the corporation. One who pays out on such a check does so at his own peril.

> In the case at bar, the defendant failed to take any steps to ascertain whether the corporate-payee's endorsement was genuine and whether the "agent" had any authority from the corporation to cash these checks. The matter of good faith on the part of the defendant does not enter into the picture. The fact that the defendant did not have knowledge that the checks were stolen is not a defense. The defendant took a chance on the face of an "honest" customer, without verification, and it develops that the defendant misplaced its trust and confidence in a thief. The defendant therefore cashed these checks at its own peril.

By depositing these checks in its bank and receiving credit therefor, the defendant exercised dominion over the plaintiff's property. By obtaining the proceeds of the checks, the defendant had converted the plaintiff's property to its own use. The receiver from the thief obtains no greater rights or better title than the thief. If an action in conversion will lie against the thief, so will it against the receiver from the thief.

The plaintiff-payee is not limited to an action on a check under the Negotiable Instrument Law against each of the 49 drawee banks scattered throughout the country. It has the choice of pursuing the alternative remedy of proceeding in conversion directly against the thief and the thief's receiver (regardless of guilty knowledge).

I do not dispute that under the Negotiable Instrument Law that the drawee bank becomes liable to the payee for payment of a check bearing a forged endorsement on the ground that in such instances the bank has made payment out of its own funds rather than those of the drawer's.[7] I do not dispute that each of the 49 drawee banks can recover from the collecting bank on the ground that the collecting bank is the guarantor that all prior endorsements are not forgeries. In the final analysis, however, the collecting bank may recover from its depositor the defendant herein, which is a prior endorser to the bank but a subsequent endorser of a forged endorsement. I see no earthwhile reason for the suggested circuitous route. There's no need to cross the Mississippi by way of Siberia.

*Id.* at 786–87.

Aside from the fact that it did not apply the U.C.C., the *Sales Promotion Executives Association* case is distinguishable from the case at hand because it did not deal with the forgery of a drawer's signature; rather, it concerned the

---

7. Under the U.C.C., a drawee bank may be successfully sued for conversion by the payee, if the drawee pays a check that bears a forged payee's signature. *Gillen v. Maryland Nat'l Bank*, 274 Md. 96, 105 (1975); *see also* U.C.C. (old version) § 3–419(1)(c).

forged indorsement of the payee's signature, and the payee was the plaintiff, not the drawer. Because the U.C.C. treats forged indorsements differently from the forgery of a drawer's signature, this distinction is dispositive. *See* U.C.C. 3–419(*l*); *see also Aritor v. Chase Manhattan Bank,* 39 Misc.2d 427, 240 N.Y.S.2d 615, 616 (Sup.Ct.1963) (distinguishing the *Sales Promotion Executives Association* case on the grounds that the payee and not the drawer was the plaintiff).

In *Stockton,* the decedent's housekeeper stole 285 of the decedent's checks and forged the decedent's (drawer's) signature on each of them. *Stockton,* 576 N.Y.S.2d at 268. The housekeeper was able to cash the checks because she and the manager of the defendant supermarket entered into an illicit scheme whereby the manager would cash the checks over the drawer's forged signatures. *Id.* As a result of the scheme, "in excess of $147,000" was realized. *Id.* The *Stockton* court held that the decedent's executor could sue the defendant store (the payee of the checks) for conversion. The only analysis the court gave in support of this holding was the following:

> [T]he cause of action for conversion should not have been dismissed. By accepting and cashing decedent's stolen and forged checks, and then obtaining payment from decedent's drawee bank defendant converted decedent's stolen checks (see *Sales Promotion Executives Association v. Schlinger & Weiss, Inc.,* 234 N.Y.S.2d 785).

*Id.* at 269.

Although *Stockton* is factually on point, we decline to follow it for three reasons. First, the only authority for its decision is the *Sales Promotion Executives Association* case, which dealt with a forged indorsement and is thus distinguishable. Second, and at least as important, under section 3–419(1)(c), the $13,000 check was not converted.[8] Third, as will be seen, under Maryland common law, no conversion took place.

---

[8] Other than *Stockton,* appellant has referred us to no other case allowing a drawer whose signature has been forged to sue a payee for conversion.

## B. *The Uniform Commercial Code—Present Form*

■ Even if the $13,000 check made payable to Lennon were governed by the U.C.C. as it is presently written, Simmons still would not have been able to sue Lennon for conversion. Effective January 1, 1997, section 3–419 was redrafted and section 3–420 was added to the Code. Section 3–420 now governs conversion actions and provides:

**Conversion of instrument.**

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. *An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.*

(b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.

(c) A representative, other than a depository bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

Md.Code Ann., Com. Law I § 3–420 (1997 Repl.Vol. & Supp. 2000) (emphasis added).

The term "issuer" means "a maker [9] or drawer of an instrument." U.C.C. § 3–105(c). The term "drawer" means "a person who signs or is *identified in a draft as a person ordering payment.*" U.C.C. § 3–103(a)(3) (emphasis added).

---

**9.** "Maker" means a person who signs or is identified as a person undertaking to pay. *See* CL § 3–103(a)(5) of the U.C.C.

In the case at hand, Simmons was a drawer, as that term is defined in the Code, because he was identified in a draft as a person making payment. As shown by the emphasized portion of section 3–420(a) quoted above, a drawer whose signature is forged cannot successfully bring an action against a payee—such as Lennon—for conversion.

## C. *Common Law Action for Conversion*

■ In Hawkland, Uniform Commercial Code series, vol. 4, Commercial Papers, art. 3–899 (2000), the author says:

> From even a cursory reading of Section 3–419, it is apparent that the section was not intended to constitute the exclusive basis for an action for conversion. The drafters apparently intended only to cover those situations in which they wanted either to deviate from, or to clarify, the rule under the NIL. Consequently, the failure of section 3–419 to specify that a particular act constitutes a conversion does not imply that no action for conversion can be maintained. Rather, the contrary implication is closer to the fact. If the common law of conversion is not specifically negated by a provision of Section 3–419, the common law rule should be deemed to be incorporated into Article 3 by virtue of Section 1–103.

*Id.* (footnote omitted.)

Section 3–419 referred to by Hawkland in the above excerpt is the version that was in effect in Maryland when Lennon cashed the $13,000 check bearing Simmons's forged signature. The question then becomes whether, under Maryland common law, Simmons could recover against Lennon for conversion of the check.

■ Under Maryland common law, a conversion
is any distinct act of ownership or dominion exercised by one person over the personal property of another in denial of his rights or inconsistent with it.

*Interstate Ins. Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954) (citing *Martin v. W.W. Lanaham and Co.,* 133 Md. 525, 105 A. 777 (1919)); *see also Allied Inv. Corp. v. Jasen,* 354

Md. 547, 560, 731 A.2d 957 (1999). In the conversion count of his complaint, Simmons did not seek to have Lennon return the forged check to him. This is understandable because Lennon would no longer have had physical possession of the check once he cashed it.

Simmons alleged in his complaint:[10]

21. That on or about October 23, 1996 the [d]efendant did willfully endorse and cash and deposit the proceeds from a forged instrument in the amount of $13,000, ... and deposited said funds into his credit union accounts with the intention and result of depriving the lawful owner of these funds.

22. That as a direct and proximate result of the conduct of the [d]efendant the [p]laintiff has suffered proximate [sic] damages in the amount of $25,000.

WHEREFORE the premises considered your [p]laintiff demands judgment against [d]efendant Michael Lennon in the amount of $25,000 plus costs of this suit.[11]

The case of *Maryland Casualty Company v. Wolff,* 180 Md. 513, 25 A.2d 665 (1942), dealt with a suit by the drawer of a check against one Wolff, the payee. *Id.* at 514, 25 A.2d 665. The drawer (Fidelity and Guaranty Fire Corporation) was the employer of one John Joyce. *Id.* Joyce's job was to prepare and approve requisitions for payment to field agents and brokers. *Id.* After Joyce prepared requisitions, his employer's agent would prepare checks in conformity with Joyce's requisitions and the checks would be mailed to the payee(s). *Id.* Joyce devised a scheme whereby he would give his employer requisitions naming as payee certain friends of his; the checks would be drawn as directed, and Joyce would intercept the checks before they were mailed. *Id.* at 515, 25 A.2d 665.

---

**10.** For purposes of deciding a motion for summary judgment, a party's pleadings, including his complaint, "frame the issues." *Vanhook v. Merchants Mut. Ins. Co.,* 22 Md.App. 22, 27, 321 A.2d 540 (1974).

**11.** At trial, Simmons told Judge Platt that in the conversion count he only sought the face amount of the check. Presumably, however, he also wanted pre-judgment interest and costs.

Joyce would then convince his friends to cash the checks and give him the money by telling them

> that the money was due to him for commissions on insurance sold by him, but that the names of friends must be used because it was not customary for office employees of the corporation to collect premiums on such insurance, as it did not want its agents to know that office employees were thus engaging in the business of selling.

*Id.*

Using that scheme, Joyce got Wolff to cash one of the checks and give him (Joyce) the proceeds. *Id.* The employer's insurer (as assignee of the employer's rights) sued Wolff for conversion. The trial court ruled that Wolff had not committed the tort of conversion, and the Court of Appeals affirmed. *Id.* at 516–17, 25 A.2d 665. The *Wolff* Court said:

> Conversion of a check as a chattel, a tort, is, of course, the subject of the suit. The money represented by it is not the direct subject, as trover does not lie to recover money converted; it lies to recover damages for the tort. See authorities collected in *Davin v. Dowling,* 146 Wash. 137, 140, 262 P. 123. And the conversion alleged is a wrongful assumption of property or right of possession in the check by endorsing it, or an intermeddling with a right of possession in the corporation, an "unauthorized assumption of the powers of the true owner." *Pollock, Torts,* 14th Ed., 286; *Hammond v. Du Bois,* 131 Md. 116, 101 A. 612.

*Id.* at 515, 25 A.2d 665.

The Court's holding in *Wolff* was that although the defendant had innocently helped Joyce to defraud the employer, he had not actually interfered with the employer's right to possess the check because the employer was the check's drawer and not its payee. *Id.* at 516, 25 A.2d 665; *see also Lawson v. Commonwealth Land Title Ins. Co.,* 69 Md.App. 476, 481–82, 518 A.2d 174 (1986) (analyzing the *Wolff* decision). The significance of the fact that Wolff was the payee "flowed ... from the Court's view that only the check[ ] [itself], and not ... [its] proceeds could be the subject of conversion." *Law-*

*son,* 69 Md.App. at 482 n. 1, 518 A.2d 174. The holding in *Wolff* is of particular relevance here because Simmons, like the plaintiff in the *Wolff* case, sued for the proceeds of the check— not for the return of the check itself.

In *Lawson,* Judge Wilner, for this Court, focused on the statement in *Wolff* that " '[t]he money represented by [the check] is not the direct subject [of a conversion action], as trover did not lie to recover money converted; it lies to recover damages for the tort.' " *Id.* at 481, 518 A.2d 174. Judge Wilner explained:

> If this statement from *Wolff* is a bit cryptic, the holdings in *Davin v. Dowling* and the cases cited in it are not. The point made there, as expressed in *Shrimpton & Sons v. Culver,* 109 Mich. 577, 67 N.W. 907 (1896), cited in *Davin,* 262 P. at 125, is that, while an action of trover will lie to recover money, i.e., currency, as money is a chattel, the action "is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money entrusted to his care." *See also Larson v. Dawson,* 24 R.I. 317, 53 A. 93 (1902), also cited in *Davin.*
>
> That principle remains current. In *Lyxell v. Vautrin,* 604 F.2d 18, 21 (5th Cir.1979), applying Alabama law, the Court held: "When there is no obligation to return the identical money, but only a relationship of debtor or creditor, *an action for conversion of the funds representing the indebtedness will not lie against the debtor.*"

*Id.* at 482, 518 A.2d 174 (footnote omitted) (emphasis added).

In *Lawson,* Commonwealth Land Title Insurance Company (Commonwealth) erroneously disbursed a check to Lawson containing an overpayment of $3,966. *Id.* at 477, 518 A.2d 174. Lawson deposited the check into his personal bank account and in due course, the check was returned to Commonwealth. *Id.* Upon realization of the overpayment, Commonwealth notified Lawson and requested a refund. *Id.* at 478, 518 A.2d 174. Lawson did not return the money. *Id.* Commonwealth filed a suit alleging, *inter alia,* that Lawson unlawfully converted its funds. *Id.*

In determining whether Commonwealth had a meritorious conversion claim, the court explored the history of the common law torts of trover and conversion. Judge Wilner further explained that in recent times, conversion actions in Maryland have been expanded to recover the value underlying such intangible property as promissory notes, stock certificates, and security interests. *Id.* at 481, 518 A.2d 174. Despite this expansion, however, "there do remain some limits on the tort. The initial focus continues to be on the tangible item withheld." *Id.* Therefore, to reiterate, conversion " 'is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money entrusted to his [the defendant's] care.' " *Id.* at 482, 518 A.2d 174 (quoting *Shrimpton & Sons v. Culver,* 109 Mich. 577, 67 N.W. 907 (1896)) (citing *Lyxell v. Vautrin,* 604 F.2d 18, 21 (5th Cir. 1979)).

The *Lawson* court concluded that because Mr. Lawson deposited the funds into his personal bank account, (1) he no longer had the check, (2) he did not have any specific, identifiable proceeds from the check, and (3) therefore, an action for conversion would not lie. *Id.* at 483, 518 A.2d 174.

The Court of Appeals recently applied reasoning similar to that enunciated in *Lawson* in *Allied Investment Corp. v. Jasen,* 354 Md. 547, 731 A.2d 957 (1999). In determining whether proceeds of an investment may be the proper subject of a claim for conversion, the *Jasen* Court held that if a person retains possession of the funds in question, but commingles them with other monies, the money loses its specific identity and may no longer be the subject of a conversion action. *Id.* at 566, 731 A.2d 957.

In the case at hand, Simmons is not alleged to have segregated the funds received in 1996 when he cashed the $13,000 check. Instead, Simmons's complaint merely alleged that Lennon deposited the check in his "credit union account."

For the reasons set forth above, summary judgment was therefore appropriately granted as to the conversion count.

### C. *The Negligence Count*

"[N]egligence is the failure to exercise ordinary care. It is the doing of some act which a person of reasonable prudence would not do, or the failure to do that which a person of reasonable prudence would do if he were actuated by those considerations which ordinarily influence everyday conduct."

*Capital Raceway Promotions, Inc. v. Smith,* 22 Md.App. 224, 239, 322 A.2d 238 (1974) (quoting trial court's jury instructions).

In Maryland, in order to establish a cause of action for negligence, a plaintiff must prove: a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered. *See Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 712, 501 A.2d 35, 39 (1985); *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114, 118 (1970). Absent a duty of care, there can be no liability in negligence. *See West Va. Central v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903). There, *id.* at 666, 54 A. at 671–72, we stated:

"[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or fact, if there has been no breach of duty."

*Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 655, 762 A.2d 582 (2000).

Judge Platt ruled that Simmons was not entitled to recover against Lennon on the negligence count because Lennon, as payee, owed no duty to the drawer to warn him that his employee had attempted to pass a forged check. Appellant argues here, as he did below, that Lennon owed such a duty

and breached it. He claims that the breach caused him to lose the monies stolen from his escrow account due to the forged check paid to Lennon ($13,000), plus the amount withdrawn from his accounts by subsequent forgeries ($109,362).

The seminal case in Maryland dealing with the issue of whether a duty exists that will support a cause of action sounding in negligence when, as here, the risk of harm created by the acts of the defendant is purely economic is *Jacques v. First National Bank*, 307 Md. 527, 515 A.2d 756 (1986). The plaintiffs in *Jacques* contracted to purchase property for $142,000. *Id.* at 528, 515 A.2d 756. They agreed with the sellers to make a $30,0000 down payment, but their purchase agreement was contingent upon the buyer's obtaining financing for a portion of the contract price. *Id.* at 529, 515 A.2d 756. In this regard, the sales contract contained an unusual provision, *viz:* "Purchaser agrees to increase the down payment to whatever amount is necessary to qualify for a mortgage loan." *Id.*

The defendant bank received an application for a mortgage loan from the plaintiffs and agreed to process the loan application upon the condition that the plaintiffs pay a $144 fee for a credit and appraisal report. *Id.* The fee was paid by the plaintiffs, and the bank agreed to process the loan application and, for a period of ninety days, "lock-in" an interest rate of 11 7/8% per annum. *Id.* The Court in *Jacques* rejected the bank's contention that it owed no tort duty to the plaintiffs. *Id.* at 537, 515 A.2d 756. It concluded that contractual privity existed between the parties, which gave rise to a tort duty. *Id.* at 537–39, 515 A.2d 756.

In the course of the opinion, Judge McAuliffe said:

In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the

imposition of tort liability. *This intimate nexus is satisfied by contractual privity or its equivalent.* By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and *the principal determination of duty becomes foreseeability.*

*Id.* at 534–35, 515 A.2d 756 (footnote omitted) (emphases added). The *Jacques* Court continued:

[A]n inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, *if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent.*

*Id.* at 537, 515 A.2d 756 (emphasis added).

The rationale underlying the requirement of an intimate nexus between the parties as a condition of liability for negligent conduct creating only a risk of economic damages is to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Walpert,* 361 Md. at 671, 762 A.2d 582 (citing *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 444 (1931)).

■ In the case at hand, although the matter is not clear from the record, it seems probable that a contractual relationship of some kind may have existed between Lennon and Simmons. Apparently, Lennon orally contracted that for a fee he would serve process for Simmons whenever his services were requested. But that agreement with Simmons imposed no duties upon Lennon for activities unconnected with serving private process. Thus, in their respective capacities as the drawer of a check whose signature had been forged and the payee of the forged check, no contractual privity existed

between the parties. The question then becomes whether the equivalent of privity existed.

To answer that question, it is important to review briefly two cases decided by the New York Court of Appeals, which were relied upon by our Court of Appeals in *Jacques* and *Walpert.* Those cases are *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), and *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931).

In *Glanzer,* the plaintiffs bought bags of beans from a seller; the beans were paid for by weight. 135 N.E. at 275. The seller contracted with public weighers who determined the weight of the beans and furnished purchasers (including the plaintiffs) with a copy of a certified weight sheet after each purchase. *Id.* After the purchase of the beans was consummated, plaintiffs learned that their purchases weighed less than had been reported in the weighers' certificate and, as a consequence, sued the weigher. *Id.* The weigher contended he owed no tort duty to the plaintiffs. *Id.* The *Glanzer* Court

> held that the buyer, although having no contract with the weigher, was the known and intended beneficiary of the contract between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher. The court further concluded that as a public weigher holding itself out as skilled and careful in its calling, the defendant's "assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed" thereby.

*Jacques,* 307 Md. at 535–36, 515 A.2d 756 (quoting *Glanzer,* 135 N.E. at 276).

In *Ultramares,* public accountants prepared a certified balance sheet for their client. 174 N.E. at 442. Subsequently, the client approached a factor and asked for a loan. *Id.* at 443. The factor conditioned the loan upon receipt of a balance sheet certified by public accountants. *Id.* The client forwarded a copy of the balance sheet prepared by its accountants to the factor. *Id.* The factor, relying on misinformation contained in the balance sheet, made several advances to the accountants' client. *Id.* The factor later sued the accountant

firm when its loan was not repaid. *Id.* The court held that the public accountant who certified a balance sheet for a corporation owed no duty of care to the factor. *Id.* at 447. The *Ultramares* decision was analyzed in *Jacques* as follows:

[T]he accountants were generally on notice that the balance sheet was likely to be relied upon by others ... [and] distinguished [this] case from *Glanzer* on the basis that there was no "contractual relation, or even one approaching it, *at the root of any duty that was owing from the defendants* [i.e., the accountants] ... to the indeterminate class of persons who ... might deal with the [accountants' corporate client] in reliance on the audit." *Ultramares, supra,* at 446. In the absence of the intimate nexus found in *Glanzer,* the *Ultramares* court concluded that the accountants might be liable to the factor for deceit, but not for negligence alone.

[I]f there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made. *Id.* at 448.

Significant in both of these cases [*Glanzer* and *Ultramares*] is the fact that the court had no difficulty in finding that the actors under each contract owed a tort duty of due care to the parties with whom they had contractual privity or its legal equivalent. *See Ultramares, supra,* 174 N.E. at 444; *Glanzer, supra,* 135 N.E. at 275.

*Jacques,* 307 Md. at 536, 515 A.2d 756 (emphasis added).

As in *Ultramares,* in the case at hand there was no contractual relation at the root of any duty that was alleged to be owed by Lennon to Simmons.

The most recent economic harm only case in Maryland dealing with the issue of whether the common law recognizes a tort duty to a third party (not in contractual privity with the plaintiff) is the case of *Walpert v. Katz, supra.* In *Walpert,* the defendant (an accounting firm) was retained by Magnetics, Inc., "to perform annual audits of Magnetics' financial state-

ments as well as prepare unaudited reports for the company every six months." 361 Md. at 649, 762 A.2d 582. Magnetics was controlled by one Phillip Katz whose father, George Katz, formerly owned the company. *Id.* at 648, 762 A.2d 582. In addition to performing services for Magnetics, the defendant accounting firm prepared personal income tax returns for George Katz and his wife. *Id.* at 649, 762 A.2d 582.

In preparing certain audits and reports, the accountants (allegedly) overstated Magnetics' inventory by approximately ten times. *Id.* n. 1, 762 A.2d 582. The Katzes relied on those audits and reports in deciding to make several large loans to Magnetics. *Id.* at 693–94, 762 A.2d 582. According to an affidavit later filed by George Katz, prior to loaning the money to Magnetics, he met personally with representatives of the defendant accounting firm to look over their accounts and reports of Magnetics' finances, and the defendant accounting firm knew that the Katzes relied on their reports and audits in deciding whether to loan money to Magnetics. *Id.* at 693, 762 A.2d 582. The *Walpert* Court reaffirmed the *Jacques* holding that, in determining whether a duty exists in a case where the risk of harm is purely economic, contractual privity between the parties is not a necessity. The "equivalent of privity" will suffice. *Id.* at 680–81, 762 A.2d 582. The "equivalent of privity" that was found in *Walpert* to impose a tort duty owing to the Katzes was knowledge by the accounting firm that a particular third party was going to rely on the accountant's reports or audits. *Id.* at 693, 762 A.2d 582.

*Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988), is another economic harm only where the equivalent of privity was found to impose a duty. In *Weisman,* the issue was whether a prospective employer who was engaged in negotiations with a prospective employee, was owed a duty of due care for a statement made by the employee's agent in a pre-employment interview. *Id.* at 441, 540 A.2d 783. The *Weisman* Court said that for there to be a tort duty to use due care in making representations in such a situation, there must be either a special relationship or an "intimate nexus" between the parties. *Id.* at 448, 540 A.2d 783; *see also Griesi v. Atl.*

*Gen. Hosp.*, 360 Md. 1, 13, 756 A.2d 548 (2000). Such a relationship was found to exist in *Weisman*. The Court explained:

We cannot conclude as a matter of law that the evidence before the jury was legally insufficient to permit it to find the existence of a duty of care upon Weisman at the time he made the representations to Connors concerning the proffered employment. We think the jury could have found from the evidence that the circumstances under which the two men came together in precontractual negotiations created a sufficiently *close nexus or relationship as to impose a duty* on Weisman not negligently to make statements of present or past facts about FWC [the prospective employer] or the new position of executive vice president. The manifest purpose of the meeting between the two high level executives was for Weisman to impart, and Connors to digest, relevant and accurate information concerning FWC and the proposed new position which Weisman intended to create.

That Connors had a great stake in receiving accurate information from Weisman is readily apparent; conversely, Weisman had to realize that negligence on his part in conveying such information could result in considerable economic harm to Connors. Of course, it was Weisman's objective to "sell" Connors, prior to actual contract negotiations, on the wisdom of leaving his career employment at Ford and joining FWC. In this regard, the face-to-face precontractual discussions between Weisman and Connors more closely resemble the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship. As in *Glanzer*, Weisman could reasonably foresee the probable consequences of negligence in his negotiations with Connors. And there was no question as in *Ultramares,* of "liability in an indeterminate amount for an indeterminate time to an indeterminate class."

312 Md. at 448–49, 540 A.2d 783 (emphasis added).

The common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found,

is that in each case the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did. No such relationship existed here. Simmons made no showing that he ever relied upon Lennon to spot forgeries of his signature or that he otherwise relied on Lennon in regard to the checks that were paid from his accounts.

Although Simmons did not even attempt to show that he relied on Lennon, he does claim that when Lennon cashed the forged check the injuries he suffered were foreseeable. If true, this is important, because both *Walpert* and *Weisman* indicate that foreseeability of harm is to be taken into account when deciding whether the "equivalent of privity" exists between the litigants. *See Walpert*, 361 Md. at 671, 762 A.2d 582; *Weisman*, 312 Md. at 448–49, 540 A.2d 783.

As already demonstrated, under the U.C.C. as adopted in Maryland, the drawer whose signature is forged usually will suffer no harm because if the drawee bank pays the check the drawer has a right to have his or her account recredited. *See* n. 5, *supra.* Normally, checking account holders examine their bank statements every month to see if the statements conform to their records and in that manner forgeries are easily discovered. So long as the drawer exercises reasonable care and promptness in discovering the forgery, the drawer bank, not the drawer, will suffer loss due to the forgery of the drawer's signature.

Based on what Simmons said in his opening statement and in his testimony, it is evident that the reason Ms. Campbell's forgeries went undetected for over two years was because he relied on his "outside bookkeeper" who betrayed him by doctoring the accounts so that Ms. Campbell's defalcations would not be discovered. Apparently, Simmons never bothered to look personally at the cancelled checks or the bank statements, which were sent to him monthly. And, in this regard, Lennon contends that Simmons's blind reliance on the outside bookkeeper constitutes contributory negligence as a matter of law.

We need not decide whether Simmons was contributorily negligent. Assuming, *arguendo,* that Simmons was not contributorily negligent, there was insufficient proof presented that Lennon should have foreseen that Simmons would be injured by cashing the forged check. To have foreseen injury to the drawer, as to the $13,000 check, Lennon would have had to foresee that the forgery would go undetected for long enough that the drawer bank could escape responsibility. *See* n. 5, *supra.* Inasmuch as there was no evidence or proffered evidence that Lennon knew that Evans was acting in concert with Campbell in a scheme to defraud, or that Lennon knew that Simmons did not look at his canceled checks when the bank returned them, it cannot be said that Lennon "could reasonably foresee the probable consequence" of his negligence in failing to spot the forgery and report it to Simmons. *Weisman,* 312 Md. at 449, 540 A.2d 783. The same is equally true as to damages caused to Simmons by virtue of Campbell's subsequent forgeries of checks totalling $109,000. To impose liability against the payer of the $13,000 check for the damages occasioned by subsequent forgeries of other checks would defeat the purpose of the "intimate nexus" requirement, i.e., to avoid the imposition of liability "in an indeterminate amount for an indeterminate time...." *Walpert,* 361 Md. at 671, 762 A.2d 582.

For the above reasons, we hold that there was neither privity nor the equivalent of privity between Lennon and Simmons. Lennon, whose actions posed no risk of personal injury to anyone, owed no tort duty to Simmons to warn him that his secretary had forged one of his checks. Because no duty was owed, Judge Platt was justified in granting summary judgment on the negligence count in favor of Lennon.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**