943 A.2d 90

**SELECT EXPRESS, LLC**

v.

**AMERICAN TRADE BINDERY, INC.**

No. 2588, Sept. Term, 2006.

Court of Special Appeals of Maryland.

March 3, 2008.

608

Ryan A. Burch (Charles L. Simmons, Gorman & Williams on the brief), Baltimore, for Appellant.

Scott M. Richmond (John H. Zink, III, Venable LLP on the brief), Towson, for Appellee.

Panel: DEBORAH S. EYLER, SHARER and JAMES A. KENNEY, III, (retired, specially assigned), JJ.

JAMES A. KENNEY III, Judge, retired, specially assigned.

Appellant, Select Express, LLC ("Select Express"), cashed what purported to be payroll checks ("the counterfeit checks") drawn on a bank account of appellee, American Trade Bindery, Inc. ("ATB"). When Select Express's account was debited the amount of the counterfeit checks, Select Express sued ATB, alleging breach of contract and negligence. The Circuit Court for Baltimore City granted summary judgment in favor of ATB on both counts.

Select Express presents the following questions for review, which we have reordered:

I.   Did the Circuit Court err when it granted summary judgment in favor of ATB on the negligence count finding that ATB owed no duty of care to Select Express?

II.  Did the Circuit Court err when it narrowly construed § 3–406 of the Maryland Uniform Commercial Code and granted summary judgment in favor of ATB on the breach of contract count?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

ATB, a document binding company located in Baltimore, Maryland, typically employs forty to fifty full-time employees, including an office manager who also serves as the company's bookkeeper. ATB pays its employees weekly.

During the relevant period, ATB would submit its weekly payroll information to Paychex, a payroll services business, for processing. Paychex would prepare checks on ATB's payroll account made payable to ATB's employees and forward them, unsigned, to ATB. An authorized ATB officer would then personally sign the checks. and distribute them to the employees. ATB did not use or even possess a signature stamp, and all of the payroll checks were signed by hand. ATB did not keep blank payroll checks on its premises.

ATB maintained two bank accounts with Provident Bank of Maryland ("Provident Bank"), an operating account and the payroll account. Provident Bank issued a monthly statement for each account to ATB. Typically, ATB's office manager would reconcile the accounts within two business days after receiving the statements. Leo Jubb, ATB's Treasurer, would later review the accounts.

Select Express, operating as "Herb's Place at Upton" ("Herb's Place"), cashes payroll checks, social security checks, and income tax checks for a fee. It deposits the cashed checks into its account with Bank of America.

Between December 6, 2001 and February 21, 2002, Select Express accepted and cashed approximately eighty-seven separate checks purporting to be ATB payroll checks. It is undisputed that none of these checks were generated by Paychex or signed by anyone at ATB. They were not created on actual blank ATB check forms. The counterfeit checks, totaling $50,926.96, were presented to Select Express by approximately fifteen unidentified individuals.

In December 2001, ATB's office manager resigned. A new office manager was hired in March 2002. In the interim, Jubb assumed the bookkeeping duties. On February 13, 2002,

while reconciling ATB's accounts, Jubb discovered that the counterfeit checks had been paid from ATB's payroll account. He contacted both the police and Provident Bank. Provident Bank immediately closed the payroll account. Ultimately, Bank of America debited Select Express's account in the amount of the checks.[1]

On December 3, 2004, Select Express filed its Complaint against ATB, Provident Bank, Bank of America, and "individual John Doe, and Jane Doe 1–15."[2] As to ATB, Select Express alleged negligence and breach of contract. An Amended Complaint, which no longer included Bank of America as a defendant, was filed on April 6, 2005.

On November 13, 2006, ATB filed a Motion for Summary Judgment. Following a hearing on December 13, 2006, the circuit court entered summary judgment in favor of ATB on both the negligence count and the breach of contract count on December 14, 2006.[3]

Select Express first noted an appeal on January 12, 2007, and again on March 13, 2007, after the dismissal of claims against Provident Bank and the Does.

---

1. During his deposition, Neil Kaplan, owner of Select Express, testified that he asked Bank of America why Select Express was notified "so late," and Bank of America informed him that it was "alerted at a later date." Kaplan testified that he did not want to "push the issue with [Bank of America]" because it did not typically "service check cashers in Baltimore."

2. In its Complaint, Select Express explained:

   5. [The Does] are those individual persons who negotiated certain checks with [Select Express] under what are or may be, on information and belief, assumed names and/or false identities. The true names and addresses of the individual [Does] ... are unknown to [Select Express] which, therefore, sues [the Does] by such fictitious names; [Select Express] will amend this Complaint to set out their names and addresses when they have been ascertained.

3. The hearing referred to was presided over by Judge Glynn. For an unexplained reason, another judge of the Circuit Court for Baltimore City entered an order granting summary judgment to ATB on December 13, 2006, "all for reasons stated in the record at the hearing of 12/13/06."

### STANDARD OF REVIEW

In *Lightolier, A Div. of Genlyte Thomas Group, LLC v. Hoon,* 387 Md. 539, 552, 876 A.2d 100 (2005), the Court of Appeals said:

> The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact which is sufficiently material to be tried. Thus, once the moving party has provided the court with sufficient grounds for summary judgment, the non-moving party must produce sufficient evidence to the trial court that a genuine dispute to a material fact exists. This requires "produc[ing] facts under oath, based on personal knowledge of the affiant to defeat the motion. Bald, unsupported statements or conclusions of law are insufficient."

(Citations omitted.)

We review the circuit court's grant of summary judgment *de novo. Cochran v. Norkunas,* 398 Md. 1, 11, 919 A.2d 700 (2007). We first determine whether a genuine dispute of material fact exists; if not, we then determine whether the party in whose favor judgment was entered is entitled to judgment as a matter of law. *Id.* at 12, 919 A.2d 700. "Even where it is shown that there is a dispute as to a fact, when the resolution of that factual dispute is not material to the controversy, such dispute does not prevent the entry of judgment." *Educ. Testing Serv. v. Hildebrant,* 399 Md. 128, 140, 923 A.2d 34 (2007)(quoting *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 7–8, 327 A.2d 502 (1974)). To defeat a motion for summary judgment, the party opposing the motion must identify "with particularity each material fact as to which it is contended that there is a genuine dispute." Maryland Rule 2–501(b). "[M]ere general allegations or conclusory assertions which do not show facts in detail and with precision will not suffice to overcome a motion for summary judgment." *Educ. Testing Serv.,* 399 Md. at 139, 923 A.2d 34.

On appeal, we ordinarily "review 'only the grounds upon which the trial court relied in granting summary judgment.'"

*Standard Fire Ins. Company v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072 (2006) (quoting *Ross v. State Bd. of Elections,* 387 Md. 649, 659, 876 A.2d 692 (2005)).

## DISCUSSION

■ Select Express argues that summary judgment is not appropriate because a genuine dispute of material fact exists as to "whether ATB's actions and inactions were a 'failure to exercise ordinary care' that contributed to the forgeries." Based on our understanding of Select Express's arguments on both its contract and negligence claims, we believe such an inquiry first invites a legal analysis. Select Express's negligence argument is dependent on a duty owed to it by ATB; if there is no duty, there can be no negligence as a matter of law. *See West Virginia Central & Pittsburgh Ry. Co. v. Fuller,* 96 Md. 652, 671, 54 A. 669 (1903) ("Of course there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes another.") Its breach of contract claim rests on its assertion that ATB's actions or inactions, about which there is no material dispute, invoke the provisions of Maryland Code Annotated (1975, 2002 Repl.Vol.), § 3–406(a) of the Commercial Law Article ("CL"), which preclude a person who has substantially contributed to "the alteration of an instrument or to the making of a forged signature on an instrument" from asserting that alteration or forgery as a defense to payment. If they do not, the breach of contract count also fails as matter of law.

## I.  Negligence

■ In granting summary judgment in favor of ATB on the negligence count, the circuit court found that ATB had no duty to Select Express to check its bank account statement earlier than it did. Whether a legal duty exists is to be decided by the court, as a question of law, not an issue of fact to be submitted to a fact-finder. *Pendleton v. State,* 398 Md. 447, 462, 921 A.2d 196 (2007); *Gourdine v. Crews,* 177 Md. App. 471, 479, 935 A.2d 1146 (2007).

In response to the court's query at the summary judgment hearing, "Why did [ATB] have an obligation to ever check [its bank statements]?," Select Express's counsel responded: "There is under the law the equivalent to contractual privity and it says if there is a nexus between the parties then there can be a duty between the drawer and the party who takes the check."

Select Express argues that the nexus supporting ATB's duty to Select Express to check its bank statements in a more timely fashion arose from the fact that ATB knew or should have known that Select Express had cashed payroll checks for ATB employees over a period of time. This knowledge arose from the fact that when ATB received its checks back with the bank statement, Select Express's indorsement was on the back of the checks. This was in addition to an alleged telephone call to ATB when it first cashed an ATB payroll check.

As Select Express recognizes, when a failure to exercise due care creates the risk of economic loss only, an intimate nexus between the parties is a predicate to the imposition of tort liability. "The rationale underlying the requirement of an intimate nexus between the parties as a condition of liability for negligent conduct creating only a risk of economic damages is to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Simmons v. Lennon*, 139 Md.App. 15, 36, 773 A.2d 1064 (2001) (citing *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 671, 762 A.2d 582 (2000)). The requisite nexus may be established by contractual privity or its equivalent. *See Jacques v. First National Bank*, 307 Md. 527, 534–535, 515 A.2d 756 (1986); *Chicago Title Ins. Company v. Allfirst Bank*, 394 Md. 270, 290–291, 905 A.2d 366 (2006). Because there is no contractual relationship between Select Express and ATB, any duty must be based on the equivalent of contractual privity.

In *Farmers Bank of Maryland v. Chicago Title Ins. Co.*, 163 Md.App. 158, 177–178, 877 A.2d 1145 (2005), after an

extensive analysis of *Jacques* and *Walpert,* we recognized that the "nexus requirement may not be as close as the word 'intimate' would suggest" and in determining whether it exists, the focus is "on the defendant's knowledge." As we stated in *Simmons,* 139 Md.App. at 40–41, 773 A.2d 1064, "[t]he common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found, is that in each case the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did." *See Walpert,* 361 Md. 645, 762 A.2d 582 (An accounting firm's knowledge that a particular third party was going to rely on its audits and reports constituted the equivalent of privity.); *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988) (The equivalent of privity arose in precontractual negotiations between a prospective employer and prospective employee because the prospective employer had a duty to impart relevant and accurate information concerning the prospective employer and the proposed position.)

In determining whether the equivalent of contractual privity is present, we consider, along with ATB's knowledge of Select Express's likely reliance on ATB checking its bank statement, the recognized policy objective of limiting the potential for unpredictable and unlimited economic damages. *Chicago Title Ins. Co.,* 394 at 295, 905 A.2d 366. Here, Select Express would limit the class of potential claimants to whom ATB owes a duty to those who might be known to ATB by looking at the back of returned checks or those who might have telephoned ATB before cashing a check sometime in the past.

Even if we were to assume that the endorsement on the back of the cancelled checks provided ATB with knowledge that Select Express had been cashing payroll checks over a period of time and that Select Express had even contacted someone at ATB before cashing the first check, these actions would not communicate to ATB that Select Express was relying on ATB's internal bank statement reconciliation proce-

dures in cashing or in refraining from cashing ATB's checks. Moreover, any such reliance would be unreasonable. There was no duty.[4]

## II. Breach of Contract

Select Express's breach of contract count relies on CL § 3–406(a), which reads:

> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

The Official Comment states that "[n]o attempt is made to define particular conduct that will constitute 'failure to exercise ordinary care [that] substantially contributes to an alteration.'" "Ordinary care" is defined in CL § 3–103(a)(7) as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged."

Citing James J. White & Robert S. Summers, Uniform Commercial Code, § 16–1 at 519 (1st ed.1972), Select Express asserts as "black letter law":

> If party conducts his business in such a manner as to encourage forgeries or if he fails to use diligence in discovering forgeries on his cancelled checks, the Code (§§ 3–406, 4–406, 3–405) estops him from asserting forgery.

---

**4.** CL § 4–406(d) expressly precludes a person from asserting the unauthorized signature or alteration of an instrument as defense to payment by a bank if the person fails to examine, in a reasonably prompt matter, his or her account statement provided by the bank to ascertain whether any unauthorized payments were made. The statute does not require a bank to send its customers a statement of account, but, if the bank chooses to do so, the customer is obligated to review that statement for inaccuracies with reasonable promptness. Official Comment 1 to CL § 4–406. CL § 4–406 is essentially a defense provided to a bank against its customer's claims that a forged instrument was not properly payable, as required by CL § 4–401, when the customer failed to promptly review his or her account statements. White & Summers at 605–605.

ATB maintains that the circuit court properly granted summary judgment in its favor because "there [was] simply no cause of action for breach of contract." According to ATB, CL § 3–406(a) "does not create an affirmative cause of action as suggested by Select Express." In support of its argument, ATB points to the two preceding sections, §§ 3–404 [5] and 3–405,[6] which expressly provide that the person bearing the loss may recover from the person failing to exercise ordinary care. CL § 3–406, on the other hand, contains no such language. ATB also notes that Official Comment 1 to CL § 3–406(a) states that "Section 3–406 does not make the negligent party liable in tort for damages resulting from the alteration."

ATB also contends that CL § 3–406(a) "applies to the alteration or forgery of an otherwise valid instrument," and not to "the creation of a fake or counterfeit check." Moreover, to the extent that Official Comment 1 to § 3–406(a) suggests "that the failure to exercise control over an instrument can lead to a duty of care," ATB did not exercise control

---

**5.** § 3–404(d) provides:

With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the *person bearing the loss may recover from the person failing to exercise ordinary care* to the extent the failure to exercise ordinary care contributed to the loss.

(Emphasis added.)

**6.** § 3–405(b) provides:

(b) For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to the loss resulting from the fraud, *the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.*

(Emphasis added.)

"over [the counterfeit checks] as a maker, drawer, or issuer." Instead, "some unknown individual created, signed, and delivered the counterfeit checks." In other words, because ATB was never in possession of the counterfeit checks, it could in no way contribute to the making, alteration, or forgery of the counterfeit checks.

In its reply brief, Select Express explains that it "is not using [CL] § 3–406 as an affirmative cause of action in negligence, nor is it using it for the basis for any affirmative cause of action," even though, it contends, Maryland law does not prevent it from presenting an affirmative cause of action under CL § 3–406. Instead, Select Express relies on CL § 3–406 to support its position that it was a good faith holder of the counterfeit checks because CL § 3–406 "precludes ATB from asserting the defense that the [counterfeit checks] contained a forgery and/or alteration." [7]

Looking to the language of CL § 3–406(a), the circuit court determined that the failure to exercise ordinary care must substantially contribute to an alteration of an instrument or to the making of a forged signature or an instrument. The court explained, however, that it was not finding that someone at ATB "had to have a hand on the" counterfeit checks, but that it took more than "permitting" the scheme to continue by failing to check the bank statement: "Now [ATB's] negligence, if it was negligence, did not substantially contribute to the alteration of an instrument or to the making of a forged signature. [It] had nothing to do with those acts."

In *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park*, 392 Md. 301, 316–317, 896 A.2d 1036 (2006), the Court of Appeals summarized the rules of statutory interpretation:

In ascertaining legislative intent, we first examine the plain language of the statute, and if the plain language of the

---

**7.** Official Comment 1 states, "If the negligent party is estopped from asserting the alteration the person taking the instrument is fully protected because the taker can treat the instrument as having been issued in the altered form."

statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written. If a statute has more than one reasonable interpretation, it is ambiguous. If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.

In construing statutes, we presume that the General Assembly acted with full knowledge of prior legislation and intended statutes affecting the same subject matter "to blend into a consistent and harmonious body of law." Therefore, we read together statutes on the same subject and harmonize them to the extent possible, so as to avoid rendering either statute "or any portion, meaningless, surplusage, superfluous or nugatory."

The Court of Appeals, in *Messing v. Bank of America, N.A.,* 373 Md. 672, 685, 821 A.2d 22 (2003), addressed the use of the Official Comments included in the Commercial Law Article in its interpretation:

> Unlike most statutory enactments, the U.C.C. is accompanied by a useful aid for determining the purpose of its provisions—the official comments of the Code's draftsmen. While these comments are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to being a search for the legislature's intent when it adopted the Code.

Here, even if we assume that CL § 3–406 is applicable in the case of counterfeit checks, the question is whether ATB's failure to check its monthly bank statement for approximately 45 days somehow *"substantially contribut[ed]"* to the

creation of the counterfeit checks. In the context of CL § 3–406, we are not dealing with an alteration [8] of an otherwise valid or genuine instrument, but rather the forgery [9] of the signature of the purported maker of a counterfeit check.

CL § 3–406 does not set out any particular conduct that constitutes the failure to exercise ordinary care substantially contributing to a forgery. According to Note 2 of the Official Comment, the " 'substantially contributes' test is meant to be less stringent than a 'direct and proximate cause' test" and it is sufficient that the failure to exercise ordinary care "is a contributory cause of the alteration or signature and a substantial factor in bringing it about." Official Comment 3 provides examples that "illustrate[ ] the kind of conduct that can be the basis of a preclusion under CL § 3–406(a)." Those examples are: (1) an employer who uses a rubber signature stamp that, along with blank check forms, is kept in an unlocked drawer; (2) an insurance company sends a check to the wrong policy holder who has the same name as the claimant; and (3) a company writes a check with a large blank spacing that permits the payee to type in an alteration easily. In each example, the action or inaction complained of contributed to the making of the subject check, alteration, or forgery, and was a substantial factor in bringing it about either by improperly issuing the checks or making the check forms and signature stamps easily available.

In dealing with an earlier version of CL § 3–406,[10] the Court of Appeals, looking to "the Official Comment for guid-

---

**8.** CL § 3–407(a) states:

(a) "Alteration" means (i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other changes to an incomplete instrument relating to the obligation of a party.

**9.** While "forgery" is not defined in the Commercial Law Article, CL § 1–202(18) defines "genuine" as "free of forgery or counterfeiting."

**10.** At that time, the section read:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unautho-

ance" because "negligence" was not defined, concluded that "negligence" meant "the failure to exercise ordinary care" and held that the circuit court was not clearly erroneous in finding that the issuer of a check had substantially contributed to an unauthorized signature by failing to identify each of the payees as corporations, to advise the bank of a joint payee agreement, and to draw the check to make it payable to joint payees. In its opinion, the Court of Appeals cited *Glenn L. Martin Co. to Use of American Mut. Liability Ins. Co. v. Fidelity–Baltimore Nat'l Bank and Trust Company*, 218 Md. 28, 145 A.2d 267 (1958), an earlier case under Section 23 of the Negotiable Instruments Law. In that case, the Martin Co., which did business with two companies with the same name, issued and mailed checks to the wrong payee resulting in a forged indorsement. In both instances, the person found negligent actually issued the check.

Looking again at Note 2 of the Official Comment, we see that the "substantially contributes" test is satisfied if the failure to exercise ordinary care "is a contributing cause of the alteration or signature *and a substantial factor in bringing it about.*" (Emphasis added.) The words "substantial factor" echo Restatement (Second) of Torts § 431, which provides that "negligent conduct is a legal cause of harm to another if (a) [that] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in harm." Comment A to § 431 explains that "[t]he word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause[.]" Considerations that are, "in themselves or in combination with one

---

rized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.'
*Dominion Constr., Inc. v. First Nat'l Bank of Maryland,* 271 Md. 154, 159, 315 A.2d 69 (1974).

another[,]" important in determining whether particular conduct is a substantial factor in bringing about harm to another are set forth in § 433:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;[11]

(c) lapse of time.[12]

RESTATEMENT (SECOND) OF TORTS § 433.

This is not a case of poorly guarded signature stamps or check stock. It does not involve carelessly drawn or issued checks. There is no evidence that ATB or any of its officers or employees ever had any control over these checks or were in any way responsible for setting these checks afloat on the sea of commerce.[13] Nothing that ATB did or did not do

---

**11.** An "intervening force" is defined as "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." RESTATEMENT (SECOND) OF TORTS § 441(1). No liability results, however, when the "act of a third person in committing an intentional tort or crime is the superseding cause of harm to another resulting therefrom, ... unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." RESTATEMENT (SECOND) OF TORTS § 448

**12.** Reporter's Note (f) explains in pertinent part:

Experience has shown that where a great length of time has elapsed between the actor's negligence and harm to another, a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof. Where the time has been long, the effect of the actor's conduct may thus become so attenuated as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed.

**13.** A person may be precluded from arguing the forgery or alteration of an instrument, under CL § 3–405(b). When an employer entrusts an employee with responsibility with respect to instruments, and that

substantially contributed to the making of the counterfeit checks and forged signatures or to "bringing about" the criminal scheme. Any failure to exercise ordinary care occurred after the scheme had begun. Certainly there is no evidence to indicate that whoever was behind the scheme was relying on the alleged delay or lapse in time in reconciling the bank statements in initiating or, for that matter, even continuing the scheme. No evidence indicates that ATB had ever experienced a forged or counterfeit check prior to this situation, must less discovered a fraudulent or criminal enterprise by reviewing its bank statement and returned checks. Any delay in reviewing the bank statements was harmless in the absence of criminal actions taken by others for which and for whom ATB was in no way responsible. Because the delay did not substantially contribute to the making and issuance of the counterfeit check, or bringing about the scheme, CL § 3–406 does not support Select Express's breach of contract claim.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

employee fraudulently indorses an instrument, the loss is shifted to the employer because the employer is in the best position to avoid the loss by using care in choosing and supervising its employees and in adopting measures to prevent forged instruments. White & Summers explains:

> The drafters have concluded that the employer should bear the responsibility for the forgery of certain embezzlers—those who have "responsibility with respect to instruments," i.e., treasurers, payroll clerks, programmers of sensitive computer programs, and the like. These people are known by the employer to have the keys to the bank.... All employers should have procedures that encourage these people to be trustworthy and that expose them when they are not.

White & Summers at 586.